[Crim. No. 6228. Fourth Dist., Div. Two. Dec. 18, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
CARL ANDERS ECKSTROM, Defendant and Appellant.

998

**COUNSEL**

Keith C. Monroe for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield and Yvonne H. Behart, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GARDNER, P. J.**—Defendant was convicted by a jury of first degree murder of Deputy Sheriffs Schneider and Wilson.

On January 4, 1973, defendant approached Cecelia Vasquez, age 17, and her sister, Rosemary, age 20, at the Cerritos Shopping Mall in Los Angeles County. He told them he had a gun and would kill them if they tried anything and said that he wanted to spend some time with them and to touch them. The girls called for help and Michael Jeffries responded. The defendant then shot and killed Michael Jeffries and Rosemary Vasquez and wounded Cecelia Vasquez. A witness secured the license number of the car in which defendant fled. It was traced to the home of defendant's parents in Midway City. Los Angeles Deputy Sheriffs Wilson and Schneider responded to the radio call and proceeded to the Midway City address. Orange County Deputy Sheriff Romero accompanied them. Wilson and Schneider went to the front door, where they knocked and kicked on the door. The defendant shot and killed one of the deputies through the door and emerged from the residence carrying a semi-automatic rifle and shooting as he came out. He shot and killed the other deputy. Romero then felled defendant with a shotgun blast. The defendant said, ''Please don't kill me. I have another gun.'' On the way to the hospital, he said, ''How are the officers?'' and, ''I hope they are all right.'' He also said, ''What makes people do things like this?'' Schneider had been shot twice, Wilson 10 or 11 times.

When defendant emerged from the house, he was not only armed with a semi-automatic rifle, but was clad in a flak suit. Within minutes after the killings, officers entered the house. An automatic pistol was on the

couch. This was the gun used in the killings at the Cerritos Center. Two other pistols were found in a closet. A great deal of ammunition was observed scattered around in plain sight. A few days later, armed with a search warrant, officers searched the house and found a receipt for the flak suit in a dresser drawer.

Defendant presented extensive evidence obviously aimed at a diminished capacity defense.

Mr. Vito, a social worker, said he had known defendant in 1971 and, in his opinion, defendant was hostile and aggressive. Dr. Ogilvie, a psychologist, had examined defendant in 1971 and found that he had an emotionally unstable and hysterical personality but was not a borderline schizophrenic. Dr. Richardson, a psychologist, had examined defendant in 1968 and diagnosed him as a borderline personality, by which he meant a person with relatively transient psychotic episodes at which times he lacks the normal capacity to make judgments. Dr. Richardson also testified that under stress defendant's behavior would go markedly out of the ordinary, but that he knew what he was doing and had volitional control over himself. Dr. Comay, a psychiatrist, had diagnosed defendant in 1968 as having a schizoid personality and borderline paranoid schizophrenia.

During trial, Dr. Richardson examined defendant again and prepared a report for the court-appointed doctors,[1] Dr. Guido and Dr. Pollack. Dr. Richardson's diagnosis was schizophrenic reaction, latent type, but he did not find defendant was a psychotic.

Dr. Pollack, a court-appointed psychiatrist, found defendant to be suffering from severe psychological disturbances which impaired his judgment abilities. Dr. Pollack testified that defendant was not capable of maturely and meaningfully reflecting and understanding seriously what it all meant. He further testified that defendant was not psychotic, that although mentally ill he was capable of understanding society's requirements, that he had the capacity to understand and appreciate the wrongfulness of his acts and was legally sane at the time of the killings.

Through Dr. Pollack, defendant's version of the shootings was revealed. He told the doctor that he had shot the people in Cerritos, returned home, realized the police would come, armed himself, put on the flak suit and prepared to fight for his life in a last ditch stand. He then changed his story and said he thought the people at the door were

---

[1]The defendant had entered and withdrawn a plea of not guilty by reason of insanity.

marijuana dealers who were in some way connected with a case in which his parents had informed on a marijuana group. He said he thought they were out to get him. Dr. Pollack opined that defendant had the capacity to lie in wait and to premeditate and deliberate but not with mature, meaningful reflection; that his judgment was poor as a result of his mental illness, but at all times he had the capacity to understand what society demanded of him and of the concept of right and wrong; and that he was "crazy" but not "crazy enough" as to be legally insane or incapable of malice aforethought.

Dr. Guido, the other psychiatrist appointed by the court, was called in rebuttal. His diagnosis was that defendant has a schizoid personality, that the degree of diminution of capacity was mild and would not interfere with his mental faculties although he would have severely impaired social judgments and control, and that defendant was not suffering from a substantial loss or diminution of capacity for first degree murder; this was because he did not have a substantially reduced capacity to form the intent to kill, to premeditate, to deliberate or to harbor malice aforethought. Nor was defendant's mental condition such that he was unaware of his obligation to obey the law.

In summary, the evidence of the killings was uncontradicted. The evidence presented on behalf of defendant as to his mental condition was such that the jury could have found for or against defendant on the issue of diminished capacity. The jury found against him on that issue and there is substantial evidence supporting the verdict.

On appeal, appellate counsel, after the usual apologetic opening paragraph, attacks trial counsel with unusual fervor. Before discussing the issue of competency of this particular counsel, we would make some preliminary observations on the subject of attack on the competency of trial counsel.

History tells us that for years Cato ended every speech on every subject with Delenda est Carthago—"Carthage must be destroyed." Eventually, Carthage *was* destroyed, and since Cato was quite an active speaker one wonders just how much credit must be afforded him for his mind-numbing, metronome-like program of hate. More recently, an unsavory creature named Joseph Goebbels conceived the Big Lie—a concept by which an untruth repeated often enough and loud enough becomes, in the mind of the listener, the truth. So, too, a program of persistent and consistent attacks on the competency of trial counsel, even though such attacks are usually unwarranted, cannot but have a

deleterious effect on the legal profession. Since *People* v. *Ibarra,* 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487], such attacks have become increasingly commonplace—being presented in case after case with almost robot-like monotony.

Of course, if in all or a substantial portion of these cases this contention had merit, it would be a scathing commentary on the ability of the legal profession to afford adequate representation to those charged with criminal offenses. The truth of the matter is that in the vast majority of cases the contention totally lacks substance. A careful, objective review of the record usually reveals that trial counsel was a capable, competent (and if a public defender, overworked, underpaid and unappreciated) attorney who, usually faced with overwhelming odds, gave his client a vigorous, skilled and dedicated representation. The fact that trial counsel has been unsuccessful in those cases which come before us is usually no reflection on that attorney. It is very difficult to secure an acquittal when the district attorney has all the firepower. A true legal genius, a trial lawyer who combines the attributes of Daniel Webster, Clarence Darrow and all those currently popular advocates who write books about themselves, cannot do more in some cases except to insure that his client's legal rights are protected and that he gets a fair trial. The fact that there is a conviction is immaterial. Some defendants simply *are* guilty, and their guilt can be overwhelmingly established by legally admissible evidence while at the same time giving full recognition to their legal and constitutional rights.

Nevertheless, these attacks on trial counsel continue with monotonous regularity. It is understandable that the individual defendant, faced with unpleasant consequences of his own irresponsible behavior and being affected with man's notorious reluctance to admit error or to face up to his own mistake, will strike out blindly at all who had anything to do with his predicament—witnesses, victims, judges, prosecutors, jurors, the whole law enforcement and judicial process—and, unfortunately, his own attorney. However, the frequency with which appellate counsel present this issue is distressing. After all, appellate counsel is blessed with the gift of hindsight as he leisurely picks over the carcass of a dead lawsuit. He is not confronted with the minute to minute and second to second strategic and tactical decisions which must be made by the trial lawyer during the heat of battle. There is nothing in *In re Smith,* 3 Cal.3d 192 [90 Cal.Rptr. 1, 474 P.2d 969], or in *People* v. *Feggans,* 67 Cal.2d 444 [62 Cal.Rptr. 419, 432 P.2d 21], which says that an appellate attorney should abdicate his responsibilities as a professional man and become the lackey of his client. It is the lawyer, not the client, who after a review

of the record, chooses the issues. Doctors do not allow patients to diagnose their own ailments, and self-help brain surgery is quite rare. Just because a convicted defendant is unhappy with his trial representation does not mean that counsel on appeal must maintain a full scale attack on trial counsel. If, in his study of the record, it is appellate counsel's professional opinion that trial counsel did all that could reasonably be expected and that his representation did not deprive a defendant of a viable defense or reduce the trial to a farce or a sham, there is no compulsion on appellate counsel to carry out his client's perhaps capricious whims by presenting issues which to him, from an objective professional viewpoint, lack merit. ■ Under *Feggans,* he need only present issues which he considers arguable, not issues which his client considers arguable. If the client is unhappy, the client can address himself to the court with a request to file a supplemental brief.

None of the above should be taken to indicate that there is no such thing as inadequate representation. There are incompetent lawyers just as there are stupid judges, quack doctors and inept plumbers. The point is that this or any other contention should be made only if in the professional opinion of appellate counsel it is a legitimately arguable issue. The client should not be allowed to define the issues. That is a job for a professional.

Turning to the instant case, we observe that while trial lawyers come in all shapes and sizes and no two trial lawyers are identical in style, they fall, generally, into two categories.

The first category files every conceivable motion and presents issues ad nauseam. This attorney slows down the wheels of the administration of justice, exasperates trial judges, and bores and often succeeds in confusing juries. He does everything "by the book" and his win-loss ratio usually leaves much to be desired. On appeal, it must be conceded that he has made a good record. No stone has been left unturned. Of course, he lost his case but he has made a dandy record. It would appear from the contents of the brief filed in this case that appellate counsel is an admirer of this school of trial attorneys.

The second category of trial attorneys is usually much more effective. He has the capacity for reducing issues to simple terms. He is as miserly with motions, objections and issues as an Ernest Hemingway with words or a Louis Armstrong with musical notes. He has an instinct for the jugular, an ability to explore the meritorious and to ignore the trivial, a capacity for keeping issues understandable, a high respect for the

intelligence of the jury, and by reason of all this is usually as effective as the attorney in the first category is ineffective. Of course, to the nitpicker, his record on appeal leaves much to be desired since he has not pressed every motion or made every possible objection, nor has he presented issues which in his professional judgment were a waste of time.

From a reading of the transcript in the instant case, trial counsel falls into the second category. This, of course, infuriates an attorney of the first category simply because all possible objections have not been made, all possible motions have not been advanced, and all possible issues have not been explored. However, defendant's trial counsel, a deputy public defender, Ronald Butler, was not only competent, he was very good. In this case, defendant enjoyed the representation of a skilled, capable, intelligent lawyer who handled his case in a manner consistent with the highest traditions of the legal profession. Appellate counsel's attack on trial counsel gives substance to Bernard Witkin's recent comments at a meeting of the Conference of California Judges to the effect that the appellate courts increasingly find themselves questioning the competency of appellate counsel who are questioning the competency of trial counsel. With that as a background, we will examine the attacks made upon trial counsel.

Appellate counsel first faults trial counsel for not making a motion to suppress the evidence seized in defendant's home or making an objection to its receipt into evidence.[2]

■ A motion to suppress this evidence would have been a classic exercise in futility.

After killing two people in Cerritos, the defendant had just burst from his house and in a fusillade of shots had killed two more people. The man was on a killing spree. Of course, the police went into his house immediately. The entry was not only reasonable, it was entirely legal. Given the history of the defendant up until that moment, proper police practices compelled them to enter the house immediately without waiting for a search warrant. At that moment the officers knew not what to expect when they entered the house—more dead bodies, wounded victims, or an armed confederate for all they knew. There was no detailed search of the premises, no prying into secret places. The officers went through the house looking for people and observing that which was

---

[2]Counsel did object on the ground that the evidence was cumulative—the only logical and arguable objection which could have been made. The court overruled this objection and the defendant, on appeal, makes no issue of this ruling.

in plain sight.[3] When time permitted, they did secure a search warrant for a more thorough search.

The entry into the house, under the circumstances in this case, brings the matter clearly within the emergency doctrine of *People* v. *Sirhan,* 7 Cal.3d 710, 737-741 [102 Cal.Rptr. 385, 497 P.2d 1121] [cert.den., 410 U.S. 947 (35 L.Ed.2d 613, 93 S.Ct. 1382)]. (See also *Warden* v. *Hayden,* 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642]; *People* v. *Hill,* 12 Cal.3d 731 [117 Cal.Rptr. 393, 528 P.2d 1]; *People* v. *Roberts,* 47 Cal.2d 374 [303 P.2d 721]; *People* v. *Wallace,* 31 Cal.App.3d 865 [107 Cal.Rptr. 659]; *Carrington* v. *Superior Court,* 31 Cal.App.3d 635, 639-640 [107 Cal.Rptr. 546]; *People* v. *Gallegos,* 13 Cal.App.3d 239, 243 [91 Cal.Rptr. 517]; *People* v. *Curley,* 12 Cal.App.3d 732, 738-739 [90 Cal.Rptr. 783]; *Stevens* v. *State* (Alaska) 443 P.2d 600 [cert.den., 393 U.S. 1039 (21 L.Ed.2d 586, 89 S.Ct. 662)]; *State* v. *Sample,* 107 Ariz. 407 [489 P.2d 44]; *State* v. *Chapman* (Me.) 250 A.2d 203; *Brown* v. *State* (Tex.Crim.App.) 475 S.W.2d 938; *State* v. *Oakes,* 129 Vt. 241 [276 A.2d 18] [cert.den., 404 U.S. 965 (30 L.Ed.2d 285, 92 S.Ct. 340)]; *Lonquest* v. *State* (Wyo.) 495 P.2d 575 [cert.den., 409 U.S. 1006 (34 L.Ed.2d 299, 93 S.Ct. 432)].) Thus, trial counsel displayed no incompetency in failing to make a motion to suppress evidence seen in the house immediately after the shooting.

■ Next, trial counsel is faulted for not calling defendant as a witness. The contention is made that if defendant testified, the issues of self-defense and mistake in fact could have been presented to the jury.

Of course, second-guessing an attorney on his decision as to whether or not to call the defendant as a witness is a chancy thing. None of us know what defendant had told his attorney.

Under any circumstances, calling the defendant in this case as a witness to present a defense of self-defense when he had shot one officer and come through the door shooting at the other officer, or the defense of mistake of fact based on the defendant's alleged impression that the officers were part of a marijuana gang after he had just shot two innocent people in a parking lot who had no possible connection with the

[3]Demanding a search warrant at that time is somewhat similar to another unrealistic contention made recently in this court. A man killed a woman in her apartment and fled. The police entered the apartment to investigate the murder, found the body, searched the apartment and found evidence which was used against the defendant. On appeal, the defendant's counsel contended that under California's vicarious exclusionary rule, the police violated the constitutional rights of the dead woman by searching the apartment without a warrant, and that the defendant was entitled to avail himself of her constitutional rights.

marijuana gang, would have been the height of folly. Given the history of the Cerritos killings, and the finding of the flak suit and the armament, any reasonably proficient district attorney would have crucified the defendant on cross-examination had he attempted to present his belated defenses of self-defense and mistake of fact. Trial counsel did the only reasonable thing. The defendant's story, weird though it might have been, had been presented to the jury during the testimony of the psychiatrist. Trial counsel, very sensibly, did not expose his client to cross-examination in an effort to present to the jury a defense which could not reasonably have been acceptable to the jury. Instead, he went into defendant's mental condition and on a theory of diminished capacity tried for a verdict of less than first degree. He failed through no fault of his own, simply because the evidence against defendant was overwhelming. There was no incompetency of counsel by reason of failure to call defendant as a witness.

Defendant's last contention that his trial counsel was incompetent consists of a generalized attack on the presentation at trial of the issues of limited capacity and insanity. Basically, defendant is unhappy with the chronology of events by which the evidence on these issues was presented.

First, it should be pointed out that contrary to the usual situation with those who are represented by the office of the public defender, the defendant had the services of one attorney at all times (except for one brief pro forma appearance), and that attorney was Mr. Butler. Mr. Butler is one of the most experienced and capable attorneys in the Orange County Public Defender's office. When the public defender discovered that that office was getting this case, Mr. Butler was assigned to it, came into it immediately, and was with defendant from before arraignment to sentencing. It must also be kept in mind that Mr. Butler was obviously handling other cases of the public defender's office during this period of time.

Immediately after the arraignment, Mr. Butler made a thorough and comprehensive motion for discovery which was granted. Within three or four days after the shootings, Mr. Butler requested that two psychiatrists examine defendant. In view of the fact that these doctors were not called, a reasonable inference can be drawn that their testimony would have been of little aid to defendant on either the defense of diminished capacity or insanity.

Nevertheless, in spite of the obvious negative content of the reports of

the earlier psychiatrist, Mr. Butler shortly before trial entered an additional plea of not guilty by reason of insanity. Based on this, Doctors Pollack and Guido were appointed by the court. From their testimony and from the testimony of everyone involved in this case, it is clear that proceeding with the defense of insanity would have been a complete waste of time of everyone involved. Insofar as the diminished capacity defense was concerned, the fact that the doctors interviewed defendant during the trial rather than prior thereto is meaningless. Through their testimony the only possible defense was presented. There was no incompetency of counsel in the preparation and presentation of the issues of mental capacity and insanity.

We conclude the discussion of trial counsel's competency by quoting from some remarks made by the trial judge, one of the more knowledgeable judges on the Superior Court Bench of Orange County, made in connection with defendant's unsuccessful attempt to discharge Mr. Butler as counsel. ''The Court will merely make the observation the evidence was overwhelming. One could go on forever on any kind of trial, including a traffic trial, quibbling about one little thing or another. But again, at the risk of being repetitive, Mr. Butler conducted the trial as ably as anybody could have. . . ¶ Mr. Butler is one of the most experienced criminal defense attorneys in this or any other county. He has tried murder cases before me, I have the greatest respect for him. I think he has done everything reasonably possible. . . ¶ And so I find that Mr. Butler is exceptionally competent, he is doing everything that every criminal defense attorney could possibly do for you. . . ¶ I would further make the comment that Mr. Butler, in my experience and my knowledge of him, both in court and his general reputation, is an exceptionally able and competent defense attorney and I can conceive of nothing he could have done during the trial that he did not do.''

Defendant's other contention on appeal is rather odd. In a process akin to picking fly specks out of black pepper, he finds an instruction to be erroneous because ''it does not appear to be authorized by CALJIC.'' While the members of this court are unanimous in their admiration of the fine work done by the editors of CALJIC and its companion BAJI, we are not aware of any rule that if an instruction is not authorized by CALJIC it is somehow suspect.

The instruction complained of is CALJIC 8.11, with the modification complained of consisting of the underlined portion: ''The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed, *but it does require of the defendant 'an*

*awareness of the obligation to act within the general body of laws regulating society.' ''*

██ This modification is taken from the language of *People* v. *Conley,* 64 Cal.2d 310, at p. 322 [49 Cal.Rptr. 815, 411 P.2d 911], where Chief Justice Traynor, writing for the majority, said: "An awareness of the obligation to act within the general body of laws regulating society, however, is included in the statutory definition of implied malice in terms of an abandoned and malignant heart and in the definition of express malice as the deliberate intention unlawfully to take life." The chief justice then proceeded to point out that although one who commits euthanasia bears no ill will toward his victim, nevertheless he acts with malice if he is able to comprehend that society prohibits his act regardless of his personal belief.

The modification to CALJIC 8.11 is an accurate statement of the law. There is nothing in the language of *People* v. *Poddar,* 10 Cal.3d 750 [111 Cal.Rptr. 910, 518 P.2d 342], that casts any doubt on the accuracy of Chief Justice Traynor's language in *Conley.*

The defendant received a fair trial from a dispassionate, able and experienced trial judge. He was represented by trial counsel who was not only entirely competent but gave him excellent representation and presented in an understandable way the only defense which would reasonably be acceptable to a jury. The evidence against the defendant was overwhelming. The record is free of prejudicial error. The defendant must accept the consequences of his anti-social behavior.

Judgment affirmed.

Kaufman, J., and Whyte, J.,* concurred.

A petition for a rehearing was denied January 13, 1975, and appellant's petition for a hearing by the Supreme Court was denied February 13, 1975.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.