[Crim. No. 10504. Fourth Dist., Div. Two. Dec. 19, 1979.]

In re NICHOLAS JOHN LOWER on Habeas Corpus.

[Crim. No. 9167. Fourth Dist., Div. Two. Dec. 19, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
NICHOLAS JOHN LOWER, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, Martin Stein and Robert P. App, Deputy State Public Defenders, for Petitioner, Defendant and Appellant.

George Deukmejian, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Alan S. Meth Attorney General, and Rudolf Corona, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GARDNER, P. J.**—In this case we wrestle unsuccessfully with the growing problem of the dual attack on adequacy of counsel by both direct appeal and writ of habeas corpus. The present practice presents this issue via both vehicles. This is creating an undue burden on the

courts without any resulting benefit to defendants or to the administration of justice.

In this case the contention of inadequacy of counsel was made in the direct appeal. Additionally, the State Public Defender filed a writ of habeas corpus presenting the same issue. Since he made factual allegations which demanded a hearing, we referred the matter to the trial court to conduct such a hearing and make findings. At the same time, we reviewed the record on appeal. The first part of this opinion is based on the record on appeal.

# I
## THE DIRECT APPEAL

Defendant waived a jury[1] and was found guilty by the court of second degree murder.

A meticulous recounting of all of the evidence produced in this extensive record is unnecessary. For our purposes it may be capsulized.

Defendant and Bobbi lived together. Bobbi had a nine-month-old child. The evidence produced by the prosecution was that the defendant systematically beat the child with his hands, fists, and assorted hard objects. He developed additional concepts of child abuse—or, by his version, child discipline. He would tie the child's hands and feet together. He would strap him in his crib with leather thongs. He altered his sleeper so it amounted to a straitjacket. He sprayed him in the face to keep him awake. He locked him in a closet. He almost suffocated the child by several means. Finally, one night when the defendant and Bobbi were in bed, the child began to cry. The defendant said he would take care of it. He did. He tied the child's hands and legs behind him and placed him face down on a sleeping bag. The child subsequently suffocated on his own vomit. When interrogated by the police, the defendant admitted much of his behavior and said that he did it to discipline the child.

---

[1]Appellate counsel seems to infer that trial counsel was incompetent for waiving a jury. Given the facts of this case, any trial attorney who would go to trial before a jury should have his head examined. The district attorney was quite serious about first degree murder. Defense counsel's presentation persuaded the court that this was second degree murder. When one compares the difference in penalties between first and second degree, this was no small benefit to counsel's now unappreciative client. Getting a second degree verdict from a jury would have been nothing short of miraculous.

This statement of the defendant to the police was carried over into the defense of the case. The defense was that the defendant was a severe disciplinarian and that while the child did suffer some abuse, this abuse had nothing to do with the death of the child. By his version, the child died from choking on its own vomit but this had nothing to do with any prior mistreatment. The sleeper conversion was simply to keep the child from hurting himself. In other words, as counsel said, while the defendant may have been mistaken in the handling of this child and perhaps even brutal by ordinary standards, he was no murderer.

Both the defendant and Bobbi were originally charged with first degree murder. Bobbi pleaded guilty to involuntary manslaughter and became a prosecution witness.

Understandably, no attack is made on the sufficiency of the evidence to justify the verdict.

On appeal, defendant's sole contention is that his trial counsel was inadequate.

The test as articulated by *Pope* (*People* v. *Pope,* 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859]) is that the defendant is entitled to the reasonably competent assistance of an attorney acting as a diligent, conscientious advocate. This is substantially the standard established in *In re Saunders,* 2 Cal.3d 1033 [88 Cal.Rptr. 633, 472 P.2d 921], that the defendant is entitled to counsel reasonably likely to render and rendering reasonably effective assistance. Only a hair splitting semanticist could tell the difference. All *Pope* did was to jettison the "farce and sham" language of *People* v. *Ibarra,* 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487].

Reviewing the record in this case, it cannot be said that defendant lacked competent counsel although, of course, in a painstaking search of any record, a zealous appellate counsel can find areas in which he would quibble with trial counsel. Former Justice Robert Thompson once referred to this practice in a similar situation as "searching for fly specks in black pepper." However, we decline to be drawn into a systematic and exhaustive discussion of each and every item of complaint set forth in approximately 100 pages of the appellant's brief. We discuss those issues worthy of discussion—and on our terms.

First, the contention is made that trial counsel was inadequate because he did not make a motion to suppress items which were taken from the residence after the defendant had called the police to the residence to report the death of the baby. Of course, one answer is that counsel did make such a motion, then thought better of it and abandoned it.[2] The reason for abandoning the motion is clear. Pursuing the motion was a complete waste of time and would have been of no possible use in the defense being presented.

In the first place, the items taken at the time of defendant's arrest added precious little to the case. The list of items taken contains such vital and pivotal items of evidence as blankets, glasses, diapers, plastic bags, a baby book, photographs, paint brushes, key rings, sleepers, stuffed toys, an eight-ounce drinking glass with a picture of Casper the ghost and a "light green tie." Actually, most of the items now complained of were of value to the defense.

It must be remembered that this case was being tried to the court. Witnesses were going to testify to all the material physical facts. Trying to keep the district attorney from cluttering up the record with all these items was going to be a complete waste of everyone's time. Actually, once a jury was waived, the district attorney could well have omitted most of these items of evidence. Basically, they were junk.

In the second place, it is rather obvious that the search was valid under the rationale of *People* v. *Hill,* 12 Cal.3d 731 [117 Cal.Rptr. 393, 528 P.2d 1]; *People* v. *Eckstrom,* 43 Cal.App.3d 996 [118 Cal.Rptr. 391]; *People* v. *Superior Court* (*Henry*), 41 Cal.App.3d 636 [116 Cal.Rptr. 24]; and *People* v. *Wallace,* 31 Cal.App.3d 865 [107 Cal.Rptr. 659]. These cases stand for the principle that an immediate warrantless search of a murder scene is proper under the emergency doctrine. (*Sample* v. *Eyman,* 469 F.2d 819, relied on by appellate counsel, is hardly a controlling authority.)

There is nothing in *Mincey* v. *Arizona,* 437 U.S. 385 [57 L.Ed.2d 290, 98 S.Ct. 2408], which in any way casts doubt on that doctrine. Even if *Mincey* had in some way been anticipated by trial counsel blessed with second sight, it would not have been helpful. *Mincey* had

---

[2]The fact that counsel did not see fit to put points and authorities on his motion but joined in those of cocounsel is really nitpicking.

to do with a prolonged search over a four-day period after a murder. The search in the instant case was an immediate search of items at the actual scene by the police, who had been called there *by the defendant,* to investigate the matter.

Third, most of the seizures would clearly come within the concept of a search in the presence of the defendant at the time of his arrest of instrumentalities used to commit the crime under the rationale of *Chimel* v. *California* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034]; and *People* v. *Superior Court (Kiefer),* 3 Cal.3d 807 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559].

All in all, we cannot fault counsel for not having pursued the motion to suppress.[3]

Next, defendant faults his trial counsel for letting in evidence of defendant's prior misconduct and by actually bringing some of it up himself. This contention can be best summarized by appellate counsel's contention that trial counsel was "throwing his client on the mercy of the court." This broad and general attack on trial counsel is characterized as follows: "Inept questioning of the defendant and other witnesses which allowed inadmissible or damning testimony."

This contention shows a deplorable lack of knowledge of the realities of trial court practice. One wonders just what kind of a defense appellate counsel, secure in his law library, would have put on for this defendant.

---

[3]Appellate counsel appears to argue that motions to suppress should be made in every case—"It would be a rare case indeed when competent counsel would so decide [not to make such a motion]." Balderdash! An attorney represents the best interests of his client. He is not retained to make motions which simply clutter up the record with no benefit to his individual client. While defense counsel may indeed feel that he represents the "cutting edge of the so-called criminal law revolution" (Kirsch, Public Defenders, New West, May 7, 1979), this does not mean that each and every defense counsel is authorized to embark on such a crusade in every case, particularly if he is doing so at the expense of his client. There appear to be about 40 to 50 pretrial motions available in criminal cases. An attorney must marshal and conserve his talents and time in such a way that his client will have the benefit of his best professional services. If a motion to suppress is called for, fine. If not, there is no obligation on the part of any attorney to embark on a program of fruitless, time-consuming, nonproductive motions which, as we said in *Eckstrom, supra,* 43 Cal.App.3d 996, may make a dandy record but be of little or no value to his client. An attorney represents his client, not society as a whole.

This defendant was faced with overwhelming evidence of brutality toward this child. He could deny everything and be literally left with egg on his face, or he could attempt to rationalize his way out of the mess he was in. This he did. Through counsel he conceived a game plan. That plan is very simple. The defendant painted himself as a strict, perhaps over-strict, perhaps even brutal, disciplinarian. In his own words, he was a "very mean father." He had been a strict disciplinarian not only with this child but with his own children. This would account for the admitted abuse of the child and for some of the defendant's rather bizarre, by ordinary standards, behavior.

However, the defendant also recognized that the child's mother was now an adverse witness. So he decided to hang as much on her as possible. This he did and at the same time showed that her adverse testimony was suspect because she had made a deal with the district attorney.

Then he attempted, through a well-prepared examination of the prosecution's doctor and his own doctor, to show that the mistreatment of this child actually had nothing to do with the child's death. In other words, his defense was that although he might be a misguided man and even a bad man, he was not a murderer. His defense, as brought out by examination of the medical witnesses, was that the child simply choked on his own vomit and this had nothing to do either with any mistreatment of the child in the past or the way the child was bound at the time the child was put down.

It is to be remembered that this case was being tried to the court. Why haggle over a bunch of evidentiary rulings when the gist was going to come in anyway? Why not admit the evidence which was going to be proven anyway, then present himself with brutal candor as a strict disciplinarian and thus make some reasonable explanation of the damaging evidence. Of course, we are not privy to any conversation between counsel and his client. It may be that the defendant told his attorney that all of these allegations were true.

Thus at trial, the defendant admitted that which he could not very well avoid. He showed that the child's mother was also at fault, that she was something of a tramp, that she made a deal with the authorities for probation, and that her adverse testimony was suspect. He argued that the child suffered from some kind of natural digestive process which

caused the vomiting which led to the death. All of this was brought out by skillful examination of the pathologists. His present attack on his own doctor is simply incredible. Apparently it is his contention that calling the doctor was a tactical error because this subjected the doctor to cross-examination. There was no reason to keep the doctor off the stand when the doctor was going to give him his only possible out. The defendant, via trial counsel, presented his only possible defense. The district attorney was going for first degree murder and was very serious about it. Apparently counsel was able to persuade the court, either through his presentation of evidence or through his argument, that the matter was only second degree. Considering the ammunition the district attorney had at his disposal, the defendant has little complaint that he was convicted of second degree murder. This conviction came by reason of overwhelming evidence against him and not by any incompetence of trial counsel.

Based on the trial record, there was no inadequacy of counsel.

## II
### THE HABEAS CORPUS

A review of the transcript of the habeas corpus hearing reveals that we were embarrassingly accurate in our evaluation (second-guessing) of trial counsel. Trial counsel knew exactly what he was doing. He made mincemeat of the State Public Defender at the habeas corpus hearing. He knew the law, he had meticulously prepared the facts, he had a game plan which was almost exactly as we had outlined in the above portion of the opinion based on the trial record. He had additional reason to drop the Penal Code section 1538.5 motion which we had no way of suspecting. It turned out that he used the abandonment of the Penal Code section 1538.5 motion as a bargaining point to secure the assignment of this case to a particular judge.

Trial counsel was an experienced criminal lawyer who had tried 75 to 100 jury trials, 10 or 12 of which were murder trials. He was well prepared, he had a theory, his strategy and tactics followed that theory—and not without appreciable results. The trial court found that the defendant was rendered effective assistance of counsel and was lucky to come out with a second degree murder conviction. We adopt the findings of the trial court and find that the defendant received constitutionally effective trial representation.

### III
#### THE PROBLEM

As indicated, we use this opinion as a vehicle to suggest that the Supreme Court take a hard look at the present practice by which the contention of inadequacy of counsel is made by both direct appeal or by habeas corpus.

This is not the only case pending in our court in which this double-barrel attack on trial counsel is being made. Any reasonably alert appellate practitioner who reads page 426 of *Pope* is probably going to make the dual contention. As we survey the increasing number of these cases, we wonder if the Supreme Court might consider limiting the defendant to the use of one, but not both vehicles. If, in the opinion of appellate counsel the record shows inadequacy of trial counsel, the matter can be handled by direct appeal. If not, it should be handled by writ of habeas corpus.

The latter seems preferable because it not only affords the defendant the opportunity of presenting matters outside the record, but it also affords the accused attorney an opportunity to be heard.

Seldom in our legal system do we allow a person to be accused, tried and convicted without an opportunity to be heard. This we do on attacks on trial counsel by direct appeal. Without giving trial counsel an opportunity to be heard, we determine whether or not he is guilty of the most flagrant type of legal malpractice. It would obviously be more fair to handle the matter by writ. Let the convicted defendant make his charges, then allow the accused trial counsel to present his defense. Of course, as Justice Mosk points out in his dissent in *Pope,* this may really open up a can of worms insofar as the attorney-client relationship is concerned. But in the interests of fairness, such a procedure seems entirely appropriate. In rare cases the inadequacy of trial counsel is apparent on the record. However, in most cases it is simply a guessing game and not a very fair guessing game at that. It would be considerably more effective in a case such as this to allow the defendant to make his charges against his attorney, and then let the attorney answer those charges. Fundamental principles of due process call for no less.

*Pope* strongly suggests that the proper vehicle for testing the capabilities and competence of trial counsel is by writ of habeas corpus. We

agree. Additionally, we suggest that the writ should more properly be filed in the trial court. That court really has the feel of the case and is in a much better position to evaluate the competency of counsel than is this court after a cumbersome reference to the trial court and a review of the record in this court.

Judgment of conviction affirmed. Petition for writ of habeas corpus denied.[4]

Kaufman, J., and McDaniel, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 14, 1980.

---

[4]Defendant's contention that he is entitled to good time/work time is presently before the Supreme Court in a series of cases and should a ruling favorable to the defendant ensue from that court, he can secure appropriate relief by application to the trial court or if necessary by a writ although it is probable that this matter will be handled administratively on a statewide basis.