Filed 2/28/24  P. v. Leedy CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

|  |  |
|---|---|
| THE PEOPLE, | C098151 |
| Plaintiff and Respondent, | (Super. Ct. No. 22F01677) |
| v. | |
| RAKIM EXAVIER LEEDY, | |
| Defendant and Appellant. | |

Defendant Rakim Exavier Leedy appeals following his convictions for possessing an assault weapon, possessing a controlled substance for sale, and several other offenses. He raises two arguments:  (1) a state law generally barring possession of assault weapons violates the Second Amendment, and (2) he received ineffective assistance because his trial counsel failed to object to the trial court's finding that he had the ability to pay

1

certain fees and fines. We affirm, finding neither argument has merit, but will direct the trial court to issue an amended abstract of judgment to correct a clerical error.

BACKGROUND

While conducting surveillance, an officer saw Leedy leave an apartment with a duffel bag and a cooler. Leedy walked to a nearby car, placed the duffel bag and cooler in the trunk, and got in the passenger seat. Officers stopped the car shortly after and conducted a search. On searching the cooler in the trunk, officers found four large bags of cannabis. On searching the duffel bag in the trunk, they found, among other things, an AR-15 style rifle, a high-capacity magazine holding over 10 rounds, a Glock-style pistol, additional rounds of ammunition, MDMA, and OxyContin pills.

Following the filing of charges against Leedy, a jury found Leedy guilty of two counts of being a felon in possession of a firearm (Pen. Code,[1] § 29800, subd. (a)), three counts of possessing a controlled substance (Health & Saf. Code, §§ 11350, 11377), and one count each of possessing an assault weapon (§ 30605, subd. (a)), unlawfully possessing ammunition (§ 30305, subd. (a)(1)), receiving a large-capacity magazine (§ 32310, subd. (a)), possessing a controlled substance for sale (Health & Saf. Code, § 11378), and transporting cannabis for sale (*id.*, § 11360, subd. (a)(2)). The jury also found that Leedy was 18 or older when he transported the cannabis for sale. Following the jury's verdicts, the trial court held a bench trial and found true several allegations. It found Leedy had a prior strike conviction for assault with a firearm (§ 1170.12, subd. (b)(1); see § 1192.7, subd. (c)(31)) and found his prior convictions were of increasing seriousness (Cal. Rules of Court, rule 4.421(b)(2)).

Leedy afterward filed a motion in arrest of judgment under section 1185, arguing that the statutes prohibiting possession of assault weapons and large-capacity magazines

---

[1] Undesignated statutory references are to the Penal Code.

are unconstitutional. But the trial court denied the motion. The court sentenced Leedy to a total term of seven years four months in prison and ordered him to pay $2,200 in fees and fines. Leedy timely appealed.

DISCUSSION

I

*Second Amendment*

Leedy first raises a facial challenge to section 30605. He argues the statute, in generally prohibiting possession of an assault weapon, violates the Second Amendment of the United States Constitution. We reject his argument—an argument our court has rejected already. (*People v. Bocanegra* (2023) 90 Cal.App.5th 1236, 1239 (*Bocanegra*); see also *People v. James* (2009) 174 Cal.App.4th 662, 667 [rejecting Second Amendment challenge to § 30605's predecessor].)

A.     Bruen

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Supreme Court has found this language protects an individual right to possess and carry arms for self-defense (*District of Columbia v. Heller* (2008) 554 U.S. 570, 592, 595, 620 (*Heller*)) and, under the Fourteenth Amendment, has found this "right is fully applicable to the States" (*McDonald v. Chicago* (2010) 561 U.S. 742, 750). The court, however, has emphasized that " '[l]ike most rights, the right secured by the Second Amendment is not unlimited.' " (*New York State Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. 1, 21 (*Bruen*).) It does not extend to all weapons (*Heller,* at p. 623), nor does it prohibit all government regulation even for those weapons it covers (*Bruen,* at p. 24).

In determining whether a weapon regulation is consistent with the Second Amendment, courts apply the standard described in *Bruen*. Under that standard, a party challenging the regulation must first show the Second Amendment's plain text applies,

3

including showing that the weapons covered in the regulation are "Arms" within the meaning of the Second Amendment.  (*Bruen, supra*, 597 U.S. at p. 24; *Bevis v. City of Naperville* (7th Cir. 2023) 85 F.4th 1175, 1194 [parties challenging weapon regulation have the "burden of showing that the weapons addressed in the pertinent legislation are Arms"]; *Del. State Sportsmen's Assn., Inc. v. Del. Dept. of Safety & Homeland Sec.* (D.Del. 2023) 664 F.Supp.3d 584, 591 [same].)  Once a party has established that the Second Amendment's plain text applies, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  (*Bruen,* at p. 24.)  Courts after *Bruen* have called this two-step standard "*Bruen* step one" and "*Bruen* step two."  (*Bevis,* at p. 1198; *United States v. Alaniz* (9th Cir. 2023) 69 F.4th 1124, 1128.)

Several issues concerning this standard remain unsettled following *Bruen*.  (See *Bruen, supra*, 597 U.S. at p. 82 (conc. opn. of Barrett, J.) [mentioning "just a few unsettled questions"].)  One of those issues, and the only one we consider here, concerns whether the weapons covered in a challenged law are in common use for lawful purposes—a critical consideration under *Bruen*.  As the Supreme Court has explained, "the Second Amendment protects the possession and use of weapons that are ' "in common use at the time" ' " (*Bruen,* at p. 21) and "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns" (*Heller, supra*, 554 U.S. at p. 625).

Although the court has highlighted the importance of this consideration, it has not yet explained "whether the common-use issue belongs at *Bruen* step one or *Bruen* step two."  (*Bevis v. City of Naperville, supra*, 85 F.4th at p. 1194.)  This issue matters to the allocation of burdens.  Does the challenging party have the burden at step one to show a regulated weapon is in common use for lawful purposes?  Or does the government have the burden at step two to prove a negative—the regulated weapon is *not* in common use for lawful purposes?  Consistent with several courts that have addressed this matter, we

4

conclude that common use is properly addressed at *Bruen* step one. (*United States v. Alaniz, supra*, 69 F.4th at p. 1128; *National Assn. for Gun Rights v. Lamont* (D.Conn., Aug. 3, 2023, No. 3:22-1118 (JBA)) 2023 U.S.Dist. Lexis 134880, at p. *51; *Hanson v. District of Columbia* (D.D.C., Apr. 20, 2023, No. 22-2256 (RC)) 2023 U.S.Dist. Lexis 68782, at p. *21; *Del. State Sportsmen's Assn., Inc. v. Del. Dept. of Safety & Homeland Sec., supra*, F.Supp.3d at p. 591; *Oregon Firearms Federation, Inc. v. Brown* (D.Or. 2022) 644 F.Supp.3d 782, 799.)

Two principal considerations guide our conclusion that common use pertains more to a challenging party's need to show the Second Amendment's plain text applies (*Bruen* step one) than to the government's need to show its regulation is consistent with the historical tradition of firearm regulation (*Bruen* step two). First, in applying its own two-part standard, the *Bruen* court covered common use when discussing the applicability of the Second Amendment's plain text, not when discussing the historical tradition of firearm regulation. (*Bruen, supra*, 597 U.S. at pp. 32-34.) Second, consistent with *Bruen*, *Heller* suggests that common use is critical to understanding the types of weapons considered to be bearable "Arms," a textual issue, explaining that "the Second Amendment right . . . extends only to certain types of weapons" (*Heller, supra*, 554 U.S. at p. 623) and that "the sorts of weapons protected were those 'in common use at the time' " (*id.* at p. 627). Consistent with these authorities, we find common use is appropriately addressed at *Bruen* step one.

B.     *Applying* Bruen

Applying *Bruen*'s framework here, we find Leedy has not met his burden to show that the assault weapons covered in section 30605 are in common use for lawful purposes. Because he raises only a facial challenge, his burden is particularly heavy. Our Supreme Court—noting the relevant "standard governing facial challenges has been a matter of some debate"—has explained that a party bringing a facial challenge must either show that the law is unconstitutional in all its applications ("the strictest

5

requirement for establishing facial unconstitutionality") or that it is unconstitutional " 'in the *generality* or *great majority* of cases' " ("the more lenient standard" for establishing facial unconstitutionality). (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1126.) Leedy has made neither showing, however, for he has not shown that all, most, or even any of the assault weapons covered in section 30605 are in common use for lawful purposes. (See §§ 30510 [defining assault weapon], 30515 [further defining assault weapon].)

Attempting to show that these assault weapons are in common use, Leedy first cites our court's decision in *Bocanegra*. He claims we acknowledged there that these weapons " 'are in common use in . . . jurisdictions' " other than California. But we never wrote those words. We instead only acknowledged the possibility that assault weapons like AR-15 rifles "may be in common use in other jurisdictions." (*Bocanegra, supra*, 90 Cal.App.5th at p. 1253.) We also concluded that these weapons "are 'weapons not typically possessed by law-abiding citizens for lawful purposes' "—which if true, would be fatal to Leedy's position here. (*Id.* at p. 1252; see *Heller, supra*, 554 U.S. at p. 625 ["the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes"].)

Leedy next, quoting *New York State Rifle & Pistol Assn. v. Cuomo* (2d Cir. 2015) 804 F.3d 242, 255, asserts " 'the assault weapons . . . at issue are "in common use" as that term was used in *Heller*.' " But Leedy never shows that the assault weapons at issue in the cited case—which were weapons covered under New York and Connecticut law (*id.* at p. 247)—are the same assault weapons at issue here—which are weapons covered under California law (see *City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1099 [courts " 'are not bound to develop appellants' arguments for them' "]).

Citing another case, *Heller v. District of Columbia* (D.C. Cir. 2011) 399 U.S. App.D.C. 314 [670 F.3d 1244, 1261], Leedy contends "semi-automatic rifles are in common use" because "since 1986, roughly 1.6 million of them had been manufactured

and constituted, at that time, '5.5 percent of all firearms, and 14.4 percent of all rifles produced in the U.S. for the domestic market.' " But the quoted language shows only substantial production of semiautomatic rifles, not common use of these rifles. Production numbers and use numbers may often be correlated, but they are not the same thing. And even if we assumed that semiautomatic rifles are in common use, Leedy fails to appreciate that section 30605 does not prohibit the possession of all semiautomatic rifles. It only prohibits possession of certain types of semiautomatic rifles (see §§ 30500, 30515), and Leedy has not shown that those types of rifles are in common use.

Leedy next cites a law review article for factual support. Quoting Chapman, *Are Semiautomatic Rifles "Dangerous and Unusual" Weapons?* (2023) 54 U.Tol. L.Rev. 191, 210, he asserts: " '[S]emiautomatic rifles like the AR-15 are widely owned and used by private citizens for lawful purposes *in the millions*. As such, they are in no way among the "dangerous and unusual" weapons historically outside the ambit of the traditional right to keep and bear arms and are well within the scope of the Second Amendment's protection.' " But reviewing the quoted page of this article, we find no citation or explanation supporting this factual assertion. We decline to treat this as sufficient evidence that the assault weapons covered in section 30605 are, as Leedy claims, in common use. (See *County of Orange v. Smith* (2005) 132 Cal.App.4th 1434, 1450 [declining to take judicial notice of two law review articles].)

Even if we accepted the article's factual assertions, moreover, Leedy has failed to show that all (or even many) of the referenced rifles are assault weapons prohibited under section 30605. The term "assault weapon" is a defined term, with both section 30510 and section 30515 defining the term. Section 30515, subdivision (a)(1) provides the relevant definition here. It states that "assault weapon" means "[a] semiautomatic, centerfire rifle that does not have a fixed magazine but has any one of the following: [¶] (A) A pistol grip that protrudes conspicuously beneath the action of the weapon. [¶] (B) A thumbhole stock. [¶] (C) A folding or telescoping stock. [¶] (D) A grenade launcher or flare

7

launcher. [¶] (E) A flash suppressor. [¶] (F) A forward pistol grip." (30515, subd. (a)(1).) The jury in this case, in finding Leedy possessed an assault weapon, found that his AR-15 style rifle had one or more of these characteristics. But Leedy has not shown that any of these characteristics is typical of the rifles referenced in the law review article. Nor has he shown that these rifles are otherwise covered under the statutes defining "assault weapon."

Lastly, in his reply brief, Leedy cites *Miller v. Bonta* (S.D.Cal., Oct. 19, 2023, No. 19-cv-01537 BEN (JLB)) 2023 U.S.Dist. Lexis 188421, app. pending. That court found that assault rifles like AR-15 rifles are commonly owned for lawful purposes (*id.* at p. *23) and issued an order—since stayed—enjoining enforcement of section 30605 to the extent it applies to the assault weapons described in section 30515, subdivision (a)(1)-(8) (*Miller v. Bonta,* at pp. *97-98). But while we may certainly consider that court's analysis, neither its factual findings nor its legal conclusions are binding on our court. (*People v. Bradley* (1969) 1 Cal.3d 80, 86 ["we are not bound by the decisions of the lower federal courts even on federal questions"]; *United States v. Mendoza* (1984) 464 U.S. 154, 159-163 [the government, after receiving an adverse ruling on an issue in one case, is generally not estopped from raising that issue in another case against a different party].) We also note that its factual findings appear to conflict with our own court's findings in *Bocanegra* that these weapons are " '*not* typically possessed by law-abiding citizens for lawful purposes.' " (*Bocanegra, supra*, 90 Cal.App.5th at p. 1252, italics added; see also *People v. James, supra*, 174 Cal.App.4th at p. 676 ["assault weapons, like machine guns, are not in common use by law-abiding citizens for lawful purposes"].) Finding no evidence in the record bearing on this topic, we have no ability to weigh in on the merits of these competing factual findings. (See *Bruen, supra*, 597 U.S. at p. 25, fn. 6 [anticipating that courts will "decide a case based on the historical record compiled by the parties"].)

8

In the end, Leedy has cited nothing in the record showing that the assault weapons covered in section 30605 are in common use for lawful purposes. Nor has he cited anything outside the record sufficient to make this showing. We consequently reject his Second Amendment challenge to section 30605.

II

*Fees and Fines*

Leedy next raises a claim of ineffective assistance of counsel. Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157, he states that a trial court must account for a defendant's ability to pay when imposing fees and fines. He then contends he received ineffective assistance because his trial counsel failed to object to the trial court's finding that he had the ability to pay certain fees and fines—namely, a $1,500 restitution fine (§ 1202.4, subd. (b)), a $300 court facility fee (Gov. Code, § 70373, subd. (a)(1)), and a $400 court operations assessment fee (§ 1465.8, subd. (a)(1)). We reject his argument.

To support a claim for ineffective assistance of counsel, a defendant must (1) "show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms," and (2) "show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Although establishing ineffective assistance of counsel is often difficult, it is "particularly difficult" on direct appeal. (*Ibid.*) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)

In this case, before imposing fees and fines, the trial court specifically said it considered Leedy's ability to pay. It said: "Mr. Leedy, I want you to be aware, sir, that

9

the recommendation from Probation was to impose a $10,000 restitution fine, which is the maximum fine. I considered the fact that you will be serving a state prison sentence according to the Court's sentencing here today. I've also considered the fact that you have been able to work, and you have been successful in obtaining employment in the past, so I wanted to set the restitution amount at an[] amount I felt you had the ability to pay, sir, but, yet, wouldn't burden you with such a significant fine that when you are released from state prison that would be such a significant debt over your head, I guess is the best way to state it, Mr. Leedy. So I have significantly reduced fines and fees being imposed, because I want to help you be successful upon your release from prison, sir."

Leedy acknowledges these facts. But he argues his trial counsel should have noted that at the time of his arrest, according to the probation report, he was only "earning income erratically through under-the-table work laying concrete." He adds that his counsel should have noted that it will be harder for him to obtain this work once he is released from prison because of the additional felony convictions. Leedy then argues that had his counsel made these points and asked the court to strike the fees and stay execution of the restitution fine, there is a reasonable probability the trial court would have followed this request.

We reject his argument. The probation report, to start, says more than Leedy acknowledges. True, it noted his erratic income from laying concrete. But in the next sentence, it also noted that Leedy was employed at a restaurant around the time of his arrest. And Leedy said these two jobs kept him busy. Leedy's claim here, then, that he only earned an erratic income from laying concrete is inaccurate—and we do not find his trial counsel ineffective simply because he failed to attempt to mislead the trial court. Even setting that aside, reasonably competent counsel could have determined that an objection based on the probation report's mention of Leedy's concrete work would have been futile, for the trial court already told counsel that it had read and considered the probation report. As case law makes clear, "[c]ounsel does not render ineffective

10

assistance by failing to make motions or objections that counsel reasonably determines would be futile."  (*People v. Price* (1991) 1 Cal.4th 324, 387.)

Turning to the adverse effect of felony convictions on job prospects, Leedy treats the point as so obvious that he neglects to point to any data or citation to substantiate the claim.  He then asks us to assume that this point—though obvious—was not known by the trial court, so it was necessary for his counsel to inform the court.  We are unpersuaded.  The trial court, consistent with the probation report, found Leedy had "been able to work" and had "been successful in obtaining employment in the past," even though he had "multiple prior felony convictions."  Leedy believes his trial counsel should have objected that obtaining employment following his release would be more difficult this time given his growing felony history.  But his counsel could have reasonably concluded that an objection along these lines would only be a waste of time given the trial court's comments about Leedy's prior success in gaining employment despite already having a significant felony history.  Under these circumstances, we cannot say his counsel's conduct fell below an objective standard of reasonableness.  (See *People v. Anzalone* (2006) 141 Cal.App.4th 380, 394 ["Attorneys are not required to make every conceivable objection"]; *People v. Eckstrom* (1974) 43 Cal.App.3d 996, 1003 [attorneys are not ineffective simply because they have "not pressed every motion or made every possible objection"].)

### III

### *Clerical Error*

The People raise one issue of their own:  The abstract of judgment describes Leedy's sentence for possessing a controlled substance for sale (count 9) as one year four months, one-third the *low* term, doubled, even though the trial court ordered him to serve one year four months, one-third the *middle* term, doubled.  (See § 1170.1, subd. (a) [the "subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment"]; see also § 1170.12, subd. (c)(1) [the term for an offense with an

11

indeterminate term is doubled when the defendant has a prior serious or felony conviction].)  We agree this clerical error should be corrected, which Leedy does not dispute, and will direct the trial court to issue an amended abstract of judgment to correct this error.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

DISPOSITION

The judgment is affirmed.  The trial court is directed to correct the abstract of judgment to note that the sentence for count 9 is one year four months, one-third the *middle* term, doubled.  The court is directed to forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


                                         /s/
                              BOULWARE EURIE, J.



We concur:



      /s/
MAURO, Acting P. J.



      /s/
MESIWALA, J.



12