# MARY MARKS et al. v. STATE.

No. A-9716.　May 23, 1940.

(102 P. 2d 955.)

Hughes & Dickson, of Guymon, and Robert Burns, of Oklahoma City, for plaintiffs in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty Gen., and B. F. Willett, Co. Atty., of Buffalo, for the State.

BAREFOOT, J.   The defendants, Mary Marks, Rosa Marks, and Grover Marks, were charged in the district court of Harper county with the crime of conjoint robbery; were tried, convicted, and Mary Marks and Rosa were sentenced to be confined for five years in the State Industrial School for White Girls, at Tecumseh, and the defendent Grover Marks was sentenced to serve a term of ten years in the state penitentiary.   From the above judgment and sentence, each of the defendants has appealed.

The defendants Mary Marks and Rosa Marks are minors of the age of 13 and 14 years, respectively.

The brief of the Attorney General admits the invalidity of the judgment of the district court attempting to sentence the defendants Mary Marks and Rosa Marks to five years' imprisonment in the State Industrial School for White Girls, at Tecumseh.   It being admitted that this school not being a penal institution, and that no district court is authorized by the laws of this state to commit any children thereto.   It is further admitted that there had been no effort on the part of the state to comply

with Oklahoma Statutes 1931, sections 1733 and 1734, O. S. A. title 10, §§ 105 and 106, which provide for the procedure before juvenile offenders under the age of 16 years may be tried before a district court. Wilson v. State, 65 Okla. Cr. 10, 82 P. 2d 308; Ex parte Hightower, 13 Okla. Cr. 472, 165 P. 624; State v. Alexander, 18 Okla. Cr. 546, 196 P. 969; Ex parte Parnell, 19 Okla. Cr. 273, 200 P. 456; Ex parte Feagins, 68 Okla. Cr. 95, 99 P. 2d 526; Ex parte Midkiff, 68 Okla. Cr. 59, 99 P. 2d 525.

For the reasons above stated, the judgment of the district court of Harper county, as to the defendants Mary Marks and Rosa Marks, is reversed and remanded.

As to the defendant Grover Marks, it is contended:

First. The information upon which the plaintiffs in error were tried did not state facts sufficient to constitute the crime of conjoint robbery, and the demurrer thereto should have been sustained.

Second. The judgment and sentence of conviction of plaintiffs in error is void for the reason that there is no evidence in the record of any force being employed by plaintiffs in error, or either of them.

Third. There is no legal or competent evidence to sustain the judgment and sentences of conviction in this case.

The information upon which defendants were tried charged:

"That the said Mary Marks, Rosa Marks and Grover Marks in said county and state aforesaid, on the day and year aforesaid, did knowingly, willfully, unlawfully, wrongfully and feloniously; against the will of one E. E. Zimmerman, take, steal, and carry away Seven Hundred Fifty-seven and no/100 ($757.00) Dollars, in good and lawful money of the United States of America, the personal pro-

perty of the said E. E. Zimmerman, which said personal property the said E. E. Zimmerman did then and there against his will suffer and permit to be taken by the said Mary Marks, Rosa Marks and Grover Marks, through fear produced by force and violence and by the threats of the said Mary Marks, Rosa Marks and Grover Marks; that the said acts were done by Mary Marks, and Rosa Marks and Grover Marks, acting conjointly and together, against the will and without the consent of E. E. Zimmerman, contrary to the form of the statutes, in such cases made and provided, and against the peace and dignity of the State."

After the evidence had been presented by both the state and the defendant, and both had closed their case, the county attorney asked permission of the court to be permitted to amend the information by adding thereto these words, "that the taking of $757.00 was from the person and possession of E. E. Zimmerman." To this request the defendant objected for the reason that all the evidence had been submitted, and the case was closed both by the state and the defendant. The objection was by the court overruled, and the state was permitted to amend the information as above stated, to which defendant excepted.

The procedure with reference to the amending of informations is governed by Oklahoma Statutes 1931, section 2830, O. S. A. title 22, § 304, which is as follows:

"An information may be amended in matter of substance or form at any time before the defendant pleads without leave, and may be amended after plea on order of the court where the same can be done without material prejudice to the right of the defendant; no amendment shall cause any delay of the trial, unless for good cause shown by affidavit."

The defendant was tried, and the court instructed the jury under Oklahoma Statutes 1931, section 2552, O. S. A. title 21, § 800, which provides:

"Whenever two or more persons conjointly commit a robbery or where the whole number of persons conjointly commits a robbery and persons present and aiding such robbery amount to two or more, each and either of such persons is punishable by imprisonment in the penitentiary for not less than five years nor more than fifty years."

As the information stood before the amendment was permitted, there is no question that it was insufficient, under the section of the statute above quoted.

This is conceded in the brief filed by the Attorney General, when he states:

"We conceded that the information, as filed in district court and as it remained until amended at the close of the introduction of evidence was defective in that it did not allege that the money was taken from the person or immediate presence of the prosecuting witness."

It is contended, however, by the defendant that the information in the first place, at its most, only charged defendants with larceny from the person, and did not charge the crime of robbery, and that this not being an included offense, the court erred in permitting the amendment, and especially in view of the fact that both the state and the defendants had closed their case. The state, although admitting that the information was insufficient in the first place, contends that the defendant by the amendment was "not in any way injured or prevented from presenting his defense to the crime of robbery."

We think that the crime of larceny from the person is not an included offense where one is charged with the crime of robbery. This question has been settled by this court in the case of Monaghan v. State, 10 Okla. Cr. 89, 134 P. 77, 79, 46 L. R. A., N. S., 1149, where the court held:

"The principal question presented is the sufficiency of the evidence to sustain the verdict and judgment. It is not pretended that the prosecuting witness was put in any fear of injury to his person, and there was no evidence conducing to show that the defendant obtained or retained possession of the pocketbook by force and violence.

"Section 2364 (Rev. Laws [1910]) of our Penal Code, 21 Okla. St. Ann. § 791, defines robbery as follows: 'Robbery is a wrongful taking of personal property in the possession of another from his person or immediate presence against his will, accomplished by means of force or fear.'

"Section 2365 [Id.] 21 Okla. St. Ann. § 792, provides: 'To constitute robbery, the force or fear must be employed either to obtain or retain possession of the property, or to prevent or overcome resistance to the taking. If employed merely as a means of escape, it does not constitute robbery.'

"Section 2366 [Id.] 21 Okla. St. Ann. § 793, provides: 'When force is employed in either of the ways specified in the last section, the degree of force employed is immaterial.'

"Section 2655 [Id.] 21 Okla. St. Ann. § 1704, defines grand larceny as follows: 'Grand larceny is larceny committed in either of the following cases: First. When the property taken is of value exceeding twenty dollars. Second. When such property, although not of value exceeding twenty dollars in value is taken from the person of another.'

"The larcenous taking of property from the person of another constitutes grand larceny, except when the taking is accomplished by either force or by putting in fear; it is then robbery. Says Bishop: 'Every robbery requires either actual violence inflicted on the person robbed, or such demonstrations or threats as under the circumstances create in him reasonable apprehension of bodily injury.' 2 Bish. New Cr. Law, par. 116. Says Wharton: 'The snatching a thing is not considered a taking by force, but if there be a struggle to keep it, or any violence, or disruption, the taking is robbery, the reason

of the distinction being, that, in the former case, we can infer neither fear nor the intention violently to take in face of resisting force. If putting in fear be proved, the offense is robbery. And so where the thing is torn from the person, as an earring from the ear.' 1 Wharton, Cr. Law, par. 854. 'The violence or intimidation in robbery must precede or be contemporaneous with the taking of the property. The violence which constitutes an essential element of the crime of robbery must be actual, personal violence, but the degree of force used is immaterial. except under statutes which provide for a punishment varying with the violence which accompanies the taking. All the force that is required to make the offense a robbery is such force as is actually sufficient to overcome the victim's resistance. The mere snatching of an article from the person of another; without violence or putting in fear, is not robbery, except where there is some injury or violence to the person of the owner, or where the property snatched is so attached to the person or clothes of the owner as to afford resistance.' 34 Cyc. p. 1799, and cases cited.

"The prosecuting witness was the only person to testify to the circumstances attending the taking of the pocketbook. He admitted that he was helplessly drunk at the time, and his examination discloses the fact that he only knew that his pocketbook was taken against his will. His testimony also shows that he was not only violating the prohibition law of the state, but also the federal law, prohibiting the introduction of whiskey into the Indian country. The subsequent struggle of the defendant with other persons in attempting to escape cannot be considered to determine whether the taking was forceful, or furtive. It would seem, and we would suggest, that always in a case of this character, where the line of demarcation between offenses, as in this case, has a very narrow margin, the safe practice, where the proof may be uncertain, is to charge the lesser offense. Upon a careful review it is our opinion that the evidence did not show either force or fear in the taking of the property in question, and that the crime charged was not proved."

In the case of Ward v. State, 34 Okla. Cr. 296, 246 P. 664, 665, after announcing the rule that this court, in construing the statute, Oklahoma Statutes, 1931, sections 2891, 2892, and 2893, O. S. A. title 22, §§ 409, 410, and 411, has adopted a liberal rule, and that where an indictment or information charges the crime in ordinary and concise language, and in such a manner that a person of common understanding is enabled to know what is intended, and which defines and identifies the offense so that the accused will be enabled to defend himself if charged again with the same offense, it will not be set aside. This for the purpose of getting away from a technical construction of criminal pleadings. And a case will not be reversed unless the allegations are such that it appears to be prejudicial to the defendant. The court, in the body of the opinion, says:

"It does not allege that the taking was from the 'person or immediate presence.' It is to be doubted if this essential allegation is covered by the allegation that it was then and there taken from the possession of another by the use of and by means of firearms. Property not at the time on the person or in the immediate presence may be taken from the possession of another, in which case the offense would be larceny and not robbery."

In the case of Lowe v. State, 7 Okla. Cr. 32, 121 P. 793, 794, Judge Furman, in delivering the opinion of the court, says:

"Counsel argue at length in their brief that the court erred in permitting the information to be amended after the jury had been impaneled and sworn, and after testimony had been introduced on the part of the state. This was error, and if the rights of the accused had been in any manner prejudiced thereby the judgment of conviction would have to be reversed. * * *

"We do not think that an information should be amended after the jury has been sworn and the testimony

introduced; but, in order for such an objection to avail, it must clearly appear from the record that such proceeding was had, and that injury resulted, or could have reasonably resulted from such action."

The amendment in that case was not material and did not change the offense. It simply permitted the county attorney to strike one of the names from the information. In the instant case the amendment permitted, not only a material change in the information, but changed the crime charged from one of larceny from the person to one of conjoint robbery. This amendment would certainly be prejudicial to the defendants. The court did not instruct the jury with reference to larceny from the person, but only submitted the issue of conjoint robbery.

In the case of Cochran v. State, 4 Okla. Cr. 379, 111 P. 974, 975, the court says:

"It will be found upon an analysis of this section that the jury have no power to convict a defendant of any offense unless it is necessarily included in the offense with which he is charged in the information or indictment, or an attempt to commit such offense. If, therefore, the offense of riot is not necessarily included in that of robbery, a defendant charged only with robbery cannot lawfully be convicted of riot."

See, also, Thoreson v. State, 69 Okla. Cr. 128, 100 P. 2d 896; Kelly v. State, 12 Okla. Cr. 208, 153 P. 1094; Pozzini v. State, 7 Okla. Cr. 692, 126 P. 1040; Bohannan v. State, 11 Okla. Cr. 69, 142 P. 1092; 46 L. R. A., N. S., 1149, note.

As to the second proposition, that there was no force or fear used in this case, and, therefore, the defendant was not guilty of robbery, but at the most could only have been guilty of larceny from the person, has heretofore been discussed in the case of Monaghan v. State, supra. The distinction between larceny from the person and robbery

is sometimes very close, and the facts in this case bring it within that class. The two little girls who used whatever force was used were only 13 and 14 years of age. They only used their hands to punch the prosecuting witness, according to his own testimony, and while one was punching him from the front the other put her hand in his pocket and took the money from the billfold or pocketbook. Evidently he did not know the money was gone until they departed. We have read many authorities which will hereafter be cited, and from such reading one can but come to the conclusion that the force used in this case was not such force as was intended to be used when the statute on conjoint robbery was enacted. Kernell v. State, 53 Okla. Cr. 259, 10 P. 2d 287, and cases cited therein; Ellis v. State, 38 Okla. Cr. 243, 260 P. 93; 54 Corpus Juris § 13, p. 1019; 23 R. C. L. §§ 10 and 11, p. 1144.

But under the statute it is not necessary to use force alone, but if one is put in "fear," and by reason thereof is robbed, the terms of the statute would be complied with. The prosecuting witness testified that he was afraid to do anything to the little girls who punched him for the reason he was afraid the defendant Grover Marks, who sat in the car, had a gun, and would kill him or do him bodily harm. The evidence reveals that the defendant Grover Marks at no time spoke to the prosecuting witness. That he never had any weapon of any kind. That he made no hostile demonstration, nor threat toward him.

As stated in the case of State v. Parker, 262 Mo. 169, 170 S. W. 1121, 1123, L. R. A. 1915C, 121:

The fright of him who is robbed must be under the law an objective fright, as contradistinguished from subjective fright; it must have been due, in short, to some act on the part of accused, and not arise from the mere

temperamental timidity of the person whose property happens to be stolen from his person or presence. State v. Weinhardt, 253 Mo. 629, 161 S. W. 1151. Here defendant merely put his hand into the pocket of Buckhold while his accomplice Settle engaged him in conversation. The act of theft was wholly accomplished before Buckhold got frightened. No blow was struck or threatened; no weapon was used or shown; nor was any threat of injury, either immediate or remote, uttered by defendant. Robbery by putting in fear, then, clearly falls out of the case. In fact, learned counsel for the state do not urge this phase of robbery.

"The state does contend, however, that the force used by defendant in inserting his hand into the pocket of Buckhold and in drawing from such pocket the stolen silver coins was and constituted such violence, under our statute , to make out robbery in the first degree. In this contention we cannot agree. Here the coins stolen were lying loose in Buckhold's pocket. No force or violence was necessary to separate them from Buckhold."

These facts are very different from one where bank robbers enter into a conspiracy to rob a bank, and one sits in the car while the others participate in the robbery. The one who sits in the car is bound not only by the force, but by the fear which is caused by his associates in consummating the robbery. 54 Corpus Juris, §§ 34 and 35, p. 1020; 23 R. C. L. § 12, p. 1146; 46 L. R. A., N. S., 1149, note.

And while the distinction is a close one we think under the facts in this case that it would have been much safer for the county attorney to have charged the defendants in this case with larceny from the person, and not with the crime of conjoint robbery. It is true that the amount taken was a large sum of money, but the same principles of law apply.

This thought was expressed in the case of Monaghan v. State, supra, when the court stated:

"It would seem, and we would suggest, that always in a case of this character, where the line of demarcation between offenses, as in this case, has a very narrow margin, the safe practice, where the proof may be uncertain, is to charge the lesser offense."

The third proposition urged by defendant is, that there is no legal and competent evidence sufficient to sustain the judgment and sentence in this case.

The material evidence in chief on the part of the state was based upon the testimony of the prosecuting witness, E. E. Zimmerman. He was an old man, but the record does not reveal his exact age, and resided on his farm about eight miles north of Buffalo, in Harper county. On Sunday morning, June 11, 1939, about 10 to 11:15 a. m., he came out of his home for the purpose of turning off his windmill. The windmill was only a few hundred feet from his residence. Just as he had finished, and as he started toward his house, he saw a black automobile drive up and he started toward the same when two small girls jumped out of the car, and ran toward him and began punching him with their hands and saying to him that they were bringing him luck. A man remained in the car, and other children were in the back seat. While one of the little girls was punching him with her hands from the front, the other ran her hand in his right pants pocket and took from a billfold or pocketbook $757 in bills. The pocketbook, according to his testimony, was not taken from his pocket, and it was introduced in evidence at the trial. When the money had been taken from his pocket the man in the car hollowed to her, and said, "If you have got it, come on," and both of the girls ran to the car and the car speeded away. He did not miss the money until

the parties had left, but he knew when the little girl felt in his pocket and got the money. He did not speak to the man in the car nor did he speak to prosecuting witness. His explanation of having the money, and especially that amount, was that some years prior thereto there had been a bank failure, and he and his son had lost some money in the bank and were not able to draw their money out when they needed it, and he had decided to carry it on his person so he could have it if he needed it. That he had been to Buffalo on Saturday, the day before the robbery, and had cashed a check for some wheat he had sold and secured $11 in cash, and when he returned home Saturday evening he had placed it with the $746 which he had, and counted all of it, and had on Sunday morning looked at it, and knew that he had it. He had two deposit slips wrapped around it. It is unfortunate that on his direct or cross-examination it was not developed from what source he obtained this amount of money. Prosecuting witness further testified that he did not have any conversation in any way with the man in the car, whom he afterwards identified as defendant Grover Marks, but that he watched him and was afraid that if he did anything to the little girls who were poking him with their hands, that he had a gun and would kill him or do him bodily harm. The man in the car made no threats of any character, and he saw no firearm of any kind in his possession. Immediately after the parties left he went to the telephone and called the sheriff's office. In a little while Guy Sawyer came to his house. He had been sent by the undersheriff, who had gone to a "gypsy camp" that was out about a mile from Buffalo, and who remained there while Mr. Sawyer went to the home of the prosecuting witness. They made some examination of the car tracks, and then went to the "gypsy camp" where the undersheriff was. There

were some 45 persons in the camp, and they were fixing to eat the noonday meal. The prosecuting witness, Mr. Zimmerman, there identified the defendants, Mary Marks, Rosa Marks, and Grover Marks, as being the parties who had come to his home and robbed him of the $757. The parties had five automobiles, and he identified one of the cars as being the one in which they were riding at the time. Twenty of the party were arrested and placed in jail and the three defendants were charged with robbery as above stated.

The undersheriff testified that he went to the "camp" just after he returned to the office and received word of the call from Zimmerman. He arrived there about an hour and 45 minutes after the telephone call was made. He made no attempt to search the camp, and did not search any of the parties. No part of the $757 was ever found.

The prosecuting witness, Mr. Zimmerman, testified that he asked the undersheriff to search the camp and all of the parties who had been placed under arrest, but that he said it would be no use, and did not do so. The undersheriff denied that he had any conversation with the prosecuting witness with reference to the searching of the defendants, the camp, or any of the parties.

The defendants, being unable to make bond, were tried on June 21, 1939, nine days after the alleged offense, and were all convicted with the results as above stated.

The three defendants testified that they were not present, and did not take the money from the prosecuting witness as he stated. That they had never known or seen the prosecuting witness, Zimmerman, and that no one had ever told them he had money on his person or at his home. Six other members of the camp corroborated them, and the other testimony given by them. They stated that they

were not gypsies, but were of Brazilian descent. The defendant was born and reared at Oklahoma City, and the other two defendants, one of whom was his daughter, and the other his cousin, were born in Wichita, Kans. They were all living at Chicago at this time. That some of them were coppersmiths and silversmiths, and they did other kinds of work. That for several years they had gone to California where they worked, and picked fruit in season. That they at no time begged or told fortunes, or attempted to bless any one, or give them good luck. That they had come direct from Chicago to Ponca City where they understood they could get work. Having failed to get work, they had left Ponca City on Saturday, June 10, 1939, and had arrived at Buffalo about 6 p. m., and had secured permission to camp about a mile from there, where they were located by the undersheriff on Sunday, June 11, 1939. That after arriving there only one car of their party left on Saturday, and that was for the purpose of going to Buffalo to buy food. Two adult members went and one of them was the defendant Grover Marks. That they immediately returned to the camp and only two cars left camp on Sunday morning, one car going into Buffalo to secure groceries. This car had an old man and two boys in it. The other left there for the purpose of going to a place where a slaughter pen was located, and in close proximity to the camp. This car had three men or boys in it, and the purpose was to get some milk for the children. This they secured and returned to the camp.

This evidence was corroborated by Daniel Painter, a party who had lived at Buffalo for five years, and who worked for Mr. Fossey, at whose place they secured the milk. He testified that they came to the place and asked for water, and also to get some milk. That he told them

that they secured their water from town and they would have to go there, but if they would return in 15 minutes he would have some milk for them. That they returned in that time and he gave them some milk. He testified that one of the three who came to his place was the defendant Grover Marks, and positively identified him. He said it was about 10 o'clock, or a few minutes thereafter. This was the identical time that the prosecuting witness testified that the defendant and two little girls took from his pocket the $757. According to the evidence it was about eight miles distance between the two places.

All of the parties in the camp testified that they had religious services conducted by one of their members called "Aunt Lizzie Marks." That no one left camp except as above stated.

Mary and Rosa Marks testified they played at camp and attended the religious services, and did not leave the camp during the day until they were taken to jail by the officers.

C. H. Root testified as a witness for the defendants. He had lived in Buffalo for 35 years, and was engaged in the filling station business. That on Sunday morning June 11, 1939, some time about 11 o'clock, it could have been 10:30 or 11:30 a. m. a black V-8 Ford car came up to his filling station in which there was a man and three women, and two or three babies, and they were of foreign extraction. The women were from 25 to 40 years of age, to his judgment. They bought ten gallons of gasoline and a quart of cheap oil. The man got out of the car, but it was not the defendant Grover Marks. He told him to put in the gas and he would put in the oil, that he was in a hurry. One of the women in the back seat paid him $1.80 for the gas and oil and handed him $2 and told him

to keep the change. The car came from the west and turned south at his station. This was not the direction to the camp where defendants and their parties were located.

The state, on rebuttal, placed P. L. Wheeler on the witness stand, who testified he was a farmer living 12 miles southwest of Buffalo. That on Sunday, June 11, 1939, he was at the slaughter house of W. H. Fossey, about 10 o'clock a.m. That he had taken his children to Sunday school before going out there. That he saw Mr. Painter there and also Mr. Fossey. That he was out there about an hour and did not see the defendant Grover Marks, or any persons of like description while he was there. During the time he was there he saw a Ford V-8 car he took to be a 1939 model drive by at a high rate of speed.

W. C. Iron, in rebuttal, testified that he was a farmer living 2 miles north and 8 miles west of Buffalo. That on Thursday, June 8, 1939, one of the witnesses for the defendants, Lizzie Marks, in the middle of the afternoon had come to his house, and said, "she would like to bless him." That she was an Indian woman from Tulsa, and that the man with her was a government man. That she said it would be necessary to have a piece of money in his palm. That he did not have it and they left without further ceremony.

S. P. Lucy, in rebuttal, testified that he lived ten and a half miles northwest of Buffalo, with W. C. Iron. He saw two women who came to his place, but he could not identify any of the defendant's party as being the parties whom he saw.

Herb Edmunds testified that he lived 14 miles northeast of Buffalo. That on Wednesday, June 7, 1939, a bunch of foreign people came to his place. He identified Lizzie Marks (Aunt Lizzie), who had testified for defend-

ants, as being one of the party. They had stopped to get a drink of water, and Lizzie Marks had gotten out of the car. There was only one car.

Lizzie Marks, on surrebuttal, denied having ever been northwest or northeast of Buffalo, but testified that she and her party had come direct from Ponca City to Buffalo, on Saturday, June 10, 1939.

This was all the evidence introduced in the case. It will be noted that there is a direct conflict in the evidence. Under the well-known rule of this court a case will not be reversed where there is a conflict in the evidence, and the jury has passed upon the issue. And while the evidence in this case is very close, and there are many points upon which there may be doubt, if this was the only question involved the case would not be reversed, but from what has been heretofore stated with reference to the permitting of the amendment to the information in a material manner, affecting the prejudicial rights of the defendants, by changing its terms so as to charge a different crime from that charged in the original information, and also the question as to whether or not the force or fear used was such as under the law would constitute robbery, we are of the opinion that the case should be reversed and remanded for a new trial.

The defendants had been placed in jail and could not make bond. They were tried nine days after the crime had been committed. It was true they made no objection to this. Possibly for the reason they could not make bond, and they were anxious to be tried, thinking the evidence was insufficient, and they would be acquitted. There is no doubt in our mind that the evidence of the witnesses, W. C. Iron, S. P. Lucy, and Herb Edmunds, who were farmers residing in Harper county, and who testified to

348

seeing some of the parties in their communities on Wednesday and Thursday, June 7 and 8, 1939, and just prior to Sunday, June 11, 1939, had a strong bearing upon the verdict of the jury, and especially in view of the testimony of defendants and their party that they had not been in that community prior to Saturday, June 10, 1939, when they came from Ponca City. This evidence could not be rebutted by defendants in the short time, and not knowing what this testimony would be. If a new trial is granted in this case it will be possible for defendants and the state to establish by positive testimony which of these parties were correct with reference to this matter. This would be in the interest of justice to the defendants and to the state.

For the reasons above stated, the judgment of the district court of Harper county is reversed and remanded.

DOYLE, P. J., and JONES, J., concur.