[No. D008219. Fourth Dist., Div. One. May 30, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT KELLEY, Defendant and Appellant.

[No. D009740. Fourth Dist., Div. One. May 30, 1990.]

In re ROBERT KELLEY on Habeas Corpus.

**COUNSEL**

Gregory Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney

General, Esteban Hernandez and Lilia E. Garcia, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KREMER, P. J.**—Robert Kelley appeals his convictions of conspiracy to commit robbery (Pen. Code,[1] §§ 182, subd. 1, 211) and murder (§ 187) and petitions for a writ of habeas corpus. He contends his convictions must be reversed for insufficiency of the evidence, instructional error, and his counsel's incompetence. We find instructional error infects Kelley's conviction for conspiracy to commit robbery and order that conviction reduced to conspiracy to commit theft. In all other respects, we affirm the judgment. We deny the petition for writ of habeas corpus.

### FACTS

In May 1986, Kelley and Proceso Serrato lived in an abandoned Pacific Bell building in the Pacific Beach area of San Diego. On May 30, 14-year-old Debra Wilson and 16-year-old Bruce Mullee, two transients living "on the streets" in Pacific Beach, stayed with Kelley and Serrato in the Pacific Bell building. Wilson and Mullee had known each other for two or three weeks and had known Kelley and Serrato for one or two weeks. Mullee went by the nickname "Little Stoner." They knew Kelley as "BK" and Serrato as "Pro." Kelley and Serrato, in particular Serrato, had talked about sailors having a lot of money. One of them had said "I'd like to have checkbooks like they do." Kelley and Serrato had also talked about going to Las Vegas on May 31, stealing a car to get there.

About 9 p.m. on May 31, the group went to an alley behind a nearby 7-Eleven. They were approached by two sailors: Brian Farr who was a tall blonde, fairly muscular man, and another man who was shorter, had dark hair and was "sort of pudgy in the face." Wilson made a call at the phone at the 7-Eleven. While she was on the phone, Kelley told her that he and Serrato were going to take the sailors back to the Pacific Bell building, get them drunk and then take their money. Wilson saw Kelley and the blonde sailor, Farr, walk down the alley toward the Pacific Bell building. A little while later, Serrato entered the 7-Eleven and bought a 12-pack of Budweiser beer. A videocamera at the store recorded the sale.

While Mullee was waiting for Wilson to finish using the phone, Serrato approached and said he and Kelley were going to get the sailor drunk, have

---

[1] All statutory references are to the Penal Code unless otherwise specified.

him pass out and then take his money and leave. Serrato said they were going to play a drinking game called "Quarters." Mullee explained "Quarters" is played by flipping a quarter into a cup of beer. If the quarter lands in the cup, then the individual who flipped the quarter can require another person to drink the whole cup.

Mullee and Wilson went to the beach and returned to the Pacific Bell building later that night but were unable to enter. The next day around noon, they returned to the building and saw Farr lying facedown on the floor, apparently dead. Wilson anonymously reported Farr's death to the police.

Farr had been beaten to death with a rod or pipe. He died of a skull fracture and intracranial hemorrhage due to blunt trauma to the head. The evidence at the scene suggested Serrato and Kelley had played "Quarters" with Farr. An empty 12-pack Budweiser beer carton was found on the kitchen counter and 11 of the cans were empty or nearly so. Nine empty beer cans were on the kitchen floor lined up next to each other. Next to the beer cans written in ink on the floor were the words "The" and "Kelly." On a nearby table, was a crumpled pack of cigarettes, an ashtray and a styrofoam cup. Farr's blood-alcohol level was .21 percent. A small amount of blood was found on a chair in a location removed from Farr's body, suggesting that the assault had started near the chair and continued to the area where his body was found. Farr's wallet was found about 12 or 15 inches from his head. There was no money in the wallet. Farr's pockets had apparently been searched, his left front pocket had been turned inside out.

The next night, June 1, about 10 p.m., Serrato and Kelley were hitchhiking in Escondido and talked to David Harmon and Westin Williams for five or ten minutes. After Harmon and Westin hung some campaign signs, they saw Serrato and Kelley attempting to steal a truck. Harmon called the police. Officer Carriere responded to the call about 10:15 p.m. He arrested Serrato. The police searched for Kelley but did not find him. The police did recover Kelley's backpack from the inside of the truck. In the backpack was a notebook with a letter dated June 1 written by Kelley apparently to Mike Reggio, a 16-year-old friend in Arizona. In the letter, Kelley wrote: "Mike last night I did somethings that you would not be to happy with me for, if you remember what I said I was going to do to people to get money, well do you remember what we did to the bum at Kennedy then you know what I'm doing to get money to go away, only now I do it more, I get more money and I put more hurt in it. please do not let anyone read this, not even Rosa. Now Im going to tell you the truth, Im killing people for money, Ive rolled about 7 of them already Im going to Las Vegas today to hit people with real money, now I only have 2 gran, . . . Ill send you this letter from

Vegas, but Im writing from Cal. I hope you understand. . . . Please come."[2]

Reggio explained at trial Kelley's reference to the "bum at Kennedy" referred to an incident where a man started harassing Kelley and Reggio at a park in Tucson and Kelley had responded by pushing the man down.

On June 5, Kelley wrote a letter to Reggio which he mailed from Las Vegas. The letter was intercepted by Reggio's mother who was concerned her son might run away to Kelley. In the letter, Kelley wrote: "So then I start kicken it with some dude name PRO, pretty weird name huh? Me + PRO did pretty good, not a lot of Drugs but we Drank + man can that chinck get the bab's, we had so much pussy my dick started to shrivle up on my ass. Then me + PRO decide its not cool in San Diego or Cal. So we fuck up some assholes + say we going to Vegas to make or take money + go to Hawaii! so we start hitch-hikin east to Nevada, then we see a truck with nobody around, PRO was fucking with starter cylanod + I was trying get it going, then my friends pull up + I jumped out of the truck and started crawling on my stomach thru all kinds of mud and shit while the cops are trying to make PRO sit on the ground, . . . now they [police] start looking for me, I was about 8 feet away when the 2 cops go in the opposite way from me, happy trails. I got away, dirty as a pig but I got away . . . . Now Im on the street again and Im not high, some old man tells me he'll pay me $50.00 If I let him suck my Ralph. Ralph dont like fagets. Sure I told him, he takes me way the fuck out in the desert + I put a couple of extra holes in his head, now Im high, clean, + go to lose my money at the fucken casino again, . . ."

DISCUSSION

I

*Instructions on Conspiracy to Commit Theft Were Required*

Kelley contends he was entitled to instructions on conspiracy to commit theft as a lesser included offense of conspiracy to commit robbery.

■ The trial court has a duty to instruct the jury on principles of law which are closely and openly connected with the evidence and which are necessary to the jury's understanding of the case. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 681 [160 Cal.Rptr. 84, 603 P.2d 1].) This duty includes giving instructions on lesser included offenses when the evidence raises a

---

[2] We render the spelling in this and the following note as written.

question as to whether all of the elements of the charged offense were present. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323-324 [185 Cal.Rptr. 436, 650 P.2d 311]; *People* v. *Williams* (1988) 199 Cal.App.3d 469, 475 [245 Cal.Rptr. 61].) ■ Regardless of a request for specific instructions, the trial court must act as a neutral arbiter between the contesting parties to guide the jury on the law. (*People* v. *Wickersham, supra,* 32 Cal.3d 307, 323.)

■ Conspiracy is a specific intent crime which requires proof of an intent to agree (or conspire) to commit a particular crime. (*People* v. *Croy* (1985) 41 Cal.3d 1, 23 [221 Cal.Rptr. 592, 710 P.2d 392]; *People* v. *Horn* (1974) 12 Cal.3d 290, 296 [115 Cal.Rptr. 516, 524 P.2d 1300].) " 'To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also that they intended to commit the elements of that offense.' [Citation.]" (*People* v. *Croy, supra,* 41 Cal.3d 1, 23.) ■ The elements of robbery are (1) a taking of personal property, (2) from the person or immediate presence of another, (3) through the use of force or fear, (4) with an intent to permanently deprive the owner of his property. (§ 211; *People* v. *Morris* (1988) 46 Cal.3d 1, 19 [249 Cal.Rptr. 119, 756 P.2d 843].) Theft is a lesser included offense of robbery since theft does not require the use of force or fear in the taking. (See *People* v. *Ramkeesoon* (1985) 39 Cal.3d 346, 351 [216 Cal.Rptr. 455, 702 P.2d 613].)

The evidence here showed Kelley and Serrato had agreed to take Farr to the Pacific Bell building, to get him drunk by playing a drinking game called "Quarters" and then to take his money. Kelley and Serrato independently explained this plan to Wilson and Mullee. Wilson watched Kelley and Farr walk down the alley to the Pacific Bell building. Serrato purchased a 12-pack of beer. When Farr's body was found the next day, his blood-alcohol level was .21 percent. There were 11 empty or nearly empty beer cans and other evidence indicating the game of "Quarters" had been played. Farr's pockets had been searched and his money taken. There was evidence suggesting he had been assaulted in a different place from where his body was found.

■ From this evidence, the jury could conclude Kelley and Serrato conspired to isolate Farr, intoxicate him by the drinking game and then take his money by using threats or violence. Or, the jury could conclude Kelley and Serrato agreed to intoxicate Farr by the drinking game but planned to take his money only after he had passed out.[3] Kelley argues the

---

[3] The prosecutor argued: "It's obvious that both [Serrato] and Mr. Kelley had contemplated what they were going to do. They were going to get some beer, take him down to the

latter situation does not show an agreement to commit robbery because it does not show an agreement to use force or fear against Farr. The Attorney General responds the force element was satisfied by Kelley's and Serrato's plan to use alcohol to overcome Farr's resistance and cites *People* v. *Dreas* (1984) 153 Cal.App.3d 623 [200 Cal.Rptr. 586] in support.

In *Dreas,* the defendant was convicted of multiple robberies based on his conduct of patronizing a bar, striking up a conversation with an individual patron, suggesting that they leave to get some coffee, going to the victim's home where he surreptitiously put lorazepam, a hypnotic sedative and tranquilizer, into the victim's coffee and then taking the victim's property while the victim was unconscious. The defendant argued the evidence was insufficient to support a robbery conviction because it did not show he had used force or fear to obtain the victim's property. The *Dreas* court disagreed.

The *Dreas* court characterized the issue presented as one of first impression but found "the legal authorities and sister state cases unanimously underline that the administering of drugs to overcome the victim's resistance does constitute force within the purview of section 211." (153 Cal.App.3d at p. 628.) The court stated: "Thus, Professor Perkins addressing this issue in his treatise concluded that: 'Just as battery may be committed by the administration of poison, so the force used to obtain property from a person against his will may be applied internally.' [Citation.] Other scholars have reached identical conclusions. LeFave [*sic*] and Scott write: 'One may commit robbery by striking his victim with fist or weapon and then, having thus rendered the victim unconscious or dazed or unwilling to risk another blow, taking property away from him. One may also render one's victim helpless by more subtle means, as by administering intoxicating liquors or drugs in order to produce a state of unconsciousness or stupefaction; to act in this way is to use force for purposes of robbery.' [Citations.]" (*Ibid.*)

The *Dreas* court found *State* v. *Snyder* (1918) 41 Nev. 453 [172 P. 364] to be persuasive authority. In *Snyder,* the defendant administered a drug to a bartender and, when the bartender became unconscious, took money from the cash register. The Nevada court held the administering of the drug was "constructive force" sufficient to sustain the robbery conviction. The *Dreas* court quoted from Justice McCarren's concurring opinion in *Snyder:* " 'Force' is the power or energy by which resistance is overcome. . . . When, to take the personal effects of another, a blow is struck with a bludgeon, thereby paralyzing the victim's power of resistance, the taking

building, and after he was drunk enough, either he was going to pass out or they were going to assault him when he was unable to defend himself, which is exactly what happened."

will constitute robbery. The same effect might be produced on the victim by the physical act of administering a deadly potion. In either case resistance is involuntarily overcome. Great physical strength might be required to accomplish the result in the first instance, while a mere turning of the hand might effect the consequence in the second; force, however, is present in both. The agency through which the force operates is immaterial. The result in either case is the overcoming of resistance without the voluntary cooperation of the subject whose resistance is repressed; this is the test." (*State v. Snyder, supra,* 172 P. 364, 366-367.)

The *Dreas* court concluded: "A showing of 'force or fear' is not (and cannot be) limited to external forces such as bludgeoning the victim or displaying a lethal weapon to overcome his will and resistance. A poison or intoxicant, although internally applied, may also serve as a potent means to achieve the same goal and may also render the felonious taking of personal property a taking against the will of the victim, thereby constituting robbery." (*People* v. *Dreas, supra,* 153 Cal.App.3d 623, 628-629.)

The situations presented in the *Dreas* and *Snyder* cases are very different from the situation presented here. In the *Dreas* and *Snyder* cases, the defendant administered a drug to an unsuspecting victim and the victim was involuntarily intoxicated. Here, Kelley's and Serrato's plan was not to secretly administer a drug to an unsuspecting victim but to openly play a drinking game with a sailor who agreed to play the game. In other words, their plan involved voluntary intoxication by the victim. This is a crucial distinction. The "force" findings in the *Dreas* and *Snyder* cases depended on the surreptitious use of the drugs to overcome the victim's resistance. As was explained in Justice McCarren's concurrence in *Snyder,* the test for finding force "is the overcoming of resistance *without the voluntary co-operation* of the subject whose resistance is repressed . . . ." (*State* v. *Snyder, supra,* 172 P. 364, 367, italics added.) Here, the plan was to have the subject, Farr, voluntarily cooperate by participating in the drinking game. Thus, the "administering of an intoxicating liquor" here did not involve force by Kelley and Serrato, Farr knowingly "administered" the intoxicating liquor to himself.

In cases where the victim's lack of resistance or unconsciousness is not due to the defendant surreptitiously drugging the victim, but due to the victim's own actions, the legal authorities and courts of this and other states have found the force element lacking when the defendant takes property from an unconscious victim. Thus, LaFave and Scott, after citing the *Dreas* and *Snyder* cases for the proposition that the use of drugs to overcome a victim's resistance is using "force," explain: "It is not robbery, however, to steal from the person or presence of one for whose helplessness through

drugs or drink the thief was not responsible . . . ." (2 LaFave & Scott, Substantive Criminal Law (1986) Robbery, § 8.11, p. 447, fn. 50; see also 67 Am.Jur.2d, Robbery, § 29, p. 84 ["Taking property from the person by stealth is not robbery unless force is used in the taking. For example, there was no robbery where a billfold was removed from the victim's pocketbook while the victim was asleep."]; 77 C.J.S., Robbery, § 19, p. 461 ["The force used in stealthy abstraction of property from the pocket of the victim, or in open rifling of the pockets of one unconscious, is not the character of violence essential to robbery."].)

In cases where the evidence showed the defendant took property from a person who was voluntarily asleep or unconscious from drinking, the courts have held the evidence did not support a robbery conviction. (See, e.g., *People* v. *Russell* (1953) 118 Cal.App.2d 136, 138-139 [257 P.2d 39] [theft from drunk, robbery conviction reversed]; *Hicks* v. *State* (1974) 232 Ga. 393 [207 S.E.2d 30, 37] [theft from sleeping person; armed robbery conviction reversed]; *People* v. *Jones* (1919) 290 Ill. 603 [125 N.E. 256, 257] [pickpocket of drunk, robbery conviction reversed]; *Hall* v. *People* (1898) 171 Ill. 540 [49 N.E. 495, 496] [theft from unconscious drunk, robbery conviction reversed]; *Bowling* v. *Commonwealth* (Ky. 1952) 253 S.W.2d 21 [theft from unconscious drunk, robbery conviction reversed]; *State* v. *Cohen* (1978) 60 Ohio App.2d 182 [396 N.E.2d 235, 236] [theft from sleeping person, robbery conviction reversed]; see also *Com.* v. *Davis* (1979) 7 Mass.App. 9 [385 N.E.2d 278, 279] [discussing pickpocketing]; *People* v. *Flynn* (1984) 123 Misc.2d 1021 [475 N.Y.S.2d 334, 337] ["[S]uch activities as rolling a drunk, picking a pocket or snatching a purse from an unsuspecting and unresisting victim [citation] may properly bring forth a felony count of larceny from the person [citation]; but, because of the lack of physical force involved, these actions will not support any robbery charge."]; *Marks* v. *State* (1940) 69 Okla. Crim. 330 [102 P.2d 955, 958] [noting the force or fear element is missing when the theft is from one who is "helplessly drunk"].) As was noted by the Ohio court in *State* v. *Cohen, supra*, 396 N.E.2d 235, 236, a theft from an unconscious or sleeping person "does not pose the increased threat of actual or potential harm to the theft victim which the robbery statute was designed to discourage."

Since the facts here could support a finding Kelley's and Serrato's plan was to get Farr so drunk that he would pass out and thus they would not need to use any force or fear to take Farr's money and that a charged overt act occurred making a culpable conspiracy complete, the jury should have been instructed on conspiracy to commit theft as a lesser included offense of conspiracy to commit robbery.

■ The question remains whether the error in failing to instruct on the lesser included offense of conspiracy to commit theft requires reversal.

"An error in failing to instruct on a lesser included offense requires reversal unless it can be determined that the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. [Citation.] Such error cannot be cured by weighing the evidence and finding it not reasonably probable that a correctly instructed jury would have convicted the defendant of the lesser included offense. [Citation.]" (*People* v. *Ramkeesoon, supra*, 39 Cal.3d 346, 351-352; see also *People* v. *Lemus* (1988) 203 Cal.App.3d 470, 478 [249 Cal.Rptr. 897].)

The People do not identify nor does our review disclose any other finding of the jury indicating a resolution adverse to Kelley of the omitted factual question of a preexisting agreement to use force or fear. Accordingly, we must reverse Kelley's conviction for conspiracy to commit robbery. A conclusion Kelley's conviction of conspiracy to commit robbery cannot stand does not, however, require that we reverse the judgment for a new trial. Here, the evidence clearly shows Kelley was guilty of conspiracy to commit theft and he does not argue otherwise. His sentence for the conspiracy to commit robbery, the upper term of five years, was stayed pursuant to section 654 and would remain stayed pursuant to section 654 if the sentence were the upper term for the offense of conspiracy to commit theft. Under these circumstances, the appropriate remedy is to modify the judgment by reducing Kelley's conviction of conspiracy to commit robbery to conspiracy to commit theft and the concomitant sentence. (See *People* v. *Smith* (1984) 155 Cal.App.3d 1103, 1188, fn. 49 [203 Cal.Rptr. 196]; *People* v. *Bailey* (1974) 38 Cal.App.3d 693, 700 [113 Cal.Rptr. 514].)

II

■ Kelley argues his murder conviction must be reversed because the court did not sua sponte instruct on theft as a lesser included offense of the robbery used to support the prosecutor's felony-murder theory.[4] Kelley does not identify nor does our review of the record disclose any evidence to support a theft instruction. Hence, its omission was not error. Further,

---

[4] The jury was instructed on three theories of first degree murder: (1) a felony murder based on robbery, (2) a premeditated and deliberated killing and (3) a killing as an ordinary and probable result or in furtherance of a conspiracy. Kelley does not challenge a conviction based on the latter two theories because of the failure of the court to instruct on theft nor would such a challenge be successful. Substantial evidence in the record supports both theories and omission of the theft instructions affects neither; neither theory depends on a finding of robbery rather than theft. The premeditated and deliberated killing theory depends on Kelley's intent, reflection and planning in the killing not the taking. The conspiracy killing theory depends on the existence of a conspiracy and a killing occurring either in furtherance of the conspiracy or as an ordinary and probable result of the conspiracy; it does not depend on a finding the conspiracy was to commit robbery rather than theft.

under the circumstances of this case, failure to give such an instruction, if required, would have been harmless.

As the Supreme Court recently pointed out: " 'The principles are well established. Theft is a lesser included offense of robbery, which [latter offense] includes the element of force or fear. [Citation.] The court must instruct on a lesser included offense, even if not requested to do so, "when the evidence raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense." [Citations.]' " (*People* v. *Turner* (1990) 50 Cal.3d 668, 690 [268 Cal.Rptr. 706], quoting *People* v. *Melton* (1988) 44 Cal.3d 713, 746 [244 Cal.Rptr. 867, 750 P.2d 741], cert. den. 488 U.S. 934 [102 L.Ed.2d 346, 109 S.Ct. 329].)

Kelley does not present the argument in the manner it is usually seen; that an intent to steal was formed after the application of deadly force. (Compare *People* v. *Turner, supra*, 50 Cal.3d 668.) Rather, Kelley tacitly concedes the strength of the uncontradicted evidence that he formed an intent to steal well before the application of deadly force. Instead, pointing to his plan to drink the victim into unconsciousness, he posits that the application of deadly force followed a completed taking and, he argues, therefore cannot be robbery. On the facts of this case, he is mistaken.

Three scenarios are possible. First, that the drinking plan was not entirely successful and a partially drugged victim resisted the taking and was killed for his troubles. Such, of course, would be a classic taking by force and therefore a completed robbery. A second possibility is that the drugging was successful, the taking accomplished while the victim was unconscious following which the victim revived and was beaten to death either to prevent his recovery of the property or his report of the taking. "This argument is answered by a long line of California cases holding what would have been a mere theft is transformed into robbery if the perpetrator, having peacefully acquired the property, uses force to retain or escape with it. [Citations.]" (*People* v. *Winkler* (1986) 178 Cal.App.3d 750, 756 [224 Cal.Rptr. 28].) The third possibility, and the only one which could support the giving of a theft instruction, is that the victim was killed wholly gratuitously for reasons unconnected to the taking probably while still unconscious. Nothing but speculation supports such an interpretation of the evidence. Indeed, the physical evidence which does exist contradicts it. The victim's body was found some distance from a bloody chair located in a kitchen area. The victim had been beaten on his back and front. This evidence indicates both movement and a struggle, factors militating against the gratuitous beating of an unconscious subject.

As a review of this record discloses no evidence which would justify a conviction of the lesser offense of theft, the court was not required to give such an instruction. The same evidentiary lack causes us to reject appellant's claim his trial counsel was incompetent for failing to request a theft instruction.

Kelley's reliance on *People* v. *Ramkeesoon, supra,* 39 Cal.3d 346, in support of his position is misplaced. Kelley argues: "The evidence in this case supports the conception that the application of physical force—the fatal struggle—occurred only after the theft was completed. The plan, it will be recalled, was to get the victim drunk to the point of passing out, then take his money. In this setting, as in the one presented in *Ramkeesoon,* the temporal separation of the theft from the homicide renders the felony murder theory invalid and the first degree murder conviction reversible, accordingly."

Kelley's analysis is misfocused. The *Ramkeesoon* holding was not based on a "temporal separation of the theft from the homicide," but on evidence suggesting the *intent* to commit a theft was not formed until after the homicide was committed and therefore that the homicide was not committed as part of a robbery. Here, there was no evidence suggesting Kelley formed an intent to steal only after killing Farr.

Even were we to hold that this record somehow required a sua sponte instruction on theft as a lesser included offense of robbery, we would find the instruction's omission harmless. ■ As the Supreme Court pointed out in *People* v. *Turner, supra,* 50 Cal.3d 668: "We have long held that erroneous failure to instruct on a lesser included offense is not prejudicial if 'it is possible to determine that . . . the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. . . .' [Citations.]" (*Id.* at p. 690.) Here, as in *Turner,* the jury was instructed that the killing must have occurred "*as a result* of the commission of or attempt to commit the crime of Robbery and where there was in the mind of the perpetrator the specific intent to commit such crime. . . ." (Italics added.) Assuming the jury resolved this case on a felony-murder theory, it must necessarily have rejected the argument Kelley now advances, that the application of deadly force was gratuitous and wholly unconnected to the taking. This instruction implies a finding against him on this score. Accordingly, any failure to instruct on theft as a lesser included offense of robbery was harmless.

## III

### *Whether Substantial Evidence Supports the Conspiracy to Commit Robbery Conviction*

■ Kelley contends his conviction of conspiracy to commit robbery is not supported by substantial evidence.

Kelley's argument the evidence is insufficient to support his conspiracy to commit robbery conviction is a restatement of his contention that agreement to induce a victim's voluntary intoxication cannot supply the element of force or fear. We have resolved that issue in Kelley's favor.

## IV

### *Kelley's Writings Were Properly Admitted*

■ Kelley contends his counsel failed to provide effective assistance of counsel by not objecting to the introduction of Kelley's writings on the grounds the writings were unduly prejudicial under Evidence Code section 352.[5]

To establish denial of the right to effective assistance of counsel, the defendant " 'must show that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, [he] must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense.' " (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 581 [189 Cal.Rptr. 855, 659 P.2d 1144].)

Ordinarily, matters involving trial tactics are not subject to judicial hindsight and the courts will not attempt to second-guess trial counsel since trial counsel was in the best position to determine trial tactics in light of his or her observations of the jury's apparent reactions to the proceedings. (*People* v. *Najera* (1972) 8 Cal.3d 504, 516-517 [105 Cal.Rptr. 345, 503 P.2d 1353].) "It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively. [Citations.] [¶] Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics." (*People* v. *Floyd* (1970) 1 Cal.3d 694, 709 [83 Cal.Rptr. 608, 464 P.2d 64]; *In re Julius B.* (1977) 68 Cal.App.3d 395, 402 [137 Cal.Rptr. 341].)

---

[5] Defense counsel did object to admission of the writings on foundational grounds, i.e., that it was not sufficiently established that Kelley had written the letters.

■ Essentially, Kelley's argument is that since the decision to exclude evidence based on Evidence Code section 352 is a discretionary one and since some judges might exercise their discretion to exclude the evidence, counsel was incompetent for not moving to exclude the evidence under Evidence Code section 352. The constitutional guaranty of effective assistance of counsel, however, does not require counsel make every conceivable motion to avoid being deemed incompetent. As Justice Gardner wrote in the context of a claim defense counsel was incompetent for failing to pursue a suppression motion: "Appellate counsel appears to argue that motions to suppress should be made in every case—'It would be a rare case indeed when competent counsel would so decide [not to make such a motion].' Balderdash! An attorney represents the best interests of his client. He is not retained to make motions which simply clutter up the record with no benefit to his individual client. While defense counsel may indeed feel that he represents the 'cutting edge of the so-called criminal law revolution' [citation], this does not mean that each and every defense counsel is authorized to embark on such a crusade in every case, particularly if he is doing so at the expense of his client. There appear to be about 40 to 50 pretrial motions available in criminal cases. An attorney must marshal and conserve his talents and time in such a way that his client will have the benefit of his best professional services. If a motion to suppress is called for, fine. If not, there is no obligation on the part of any attorney to embark on a program of fruitless, time-consuming, nonproductive motions which, as we said in *Eckstrom, supra,* 43 Cal.App.3d 996, may make a dandy record but be of little or no value to his client. An attorney represents his client, not society as a whole." (*In re Lower* (1979) 100 Cal.App.3d 144, 149, fn. 3 [161 Cal.Rptr. 24].)[6]

---

[6] In *People* v. *Eckstrom* (1974) 43 Cal.App.3d 996, 1002-1003 [118 Cal.Rptr. 391], Justice Gardner noted: "[W]e observe that while trial lawyers come in all shapes and sizes and no two trial lawyers are identical in style, they fall, generally, into two categories.

"The first category files every conceivable motion and presents issues ad nauseam. This attorney slows down the wheels of the administration of justice, exasperates trial judges, and bores and often succeeds in confusing juries. He does everything 'by the book' and his win-loss ratio usually leaves much to be desired. On appeal, it must be conceded that he has made a good record. No stone has been left unturned. Of course, he lost his case but he has made a dandy record. It would appear from the contents of the brief filed in this case that appellate counsel is an admirer of this school of trial attorneys.

"The second category of trial attorneys is usually much more effective. He has the capacity for reducing issues to simple terms. He is as miserly with motions, objections and issues as an Ernest Hemingway with words or a Louis Armstrong with musical notes. He has an instinct for the jugular, an ability to explore the meritorious and to ignore the trivial, a capacity for keeping issues understandable, a high respect for the intelligence of the jury, and by reason of all this is usually as effective as the attorney in the first category is ineffective. Of course, to the nitpicker, his record on appeal leaves much to be desired since he has not pressed every motion or made every possible objection, nor has he presented issues which in his professional judgment were a waste of time."

Thus, Kelley's counsel was not incompetent merely for having failed to make the motion to exclude the writings on the basis the court might have exercised its discretion to exclude otherwise admissible evidence under Evidence Code section 352.

Kelley argues his counsel's decision not to move to exclude the evidence "was not rationally aimed at some potentially beneficial end. Counsel simply failed to consider admissibility issues beyond the subjects of coercion and privilege. . . ." In a declaration attached to Kelley's petition for habeas corpus, his trial counsel stated: "In late 1988 or early 1989 I was asked by [appellate counsel] what thought I had given to trying to have the writings excluded in whole or in part, as irrelevant, or as inadmissible under Evidence Code section 352 or 1101. I replied that the writings came as a result of a voluntary contact by the family of Mr. Kelley's best friend in Arizona, whom Mr. Kelley was in correspondence with against my suggestions. I replied further that there was in my opinion no inherent right of privacy violated in the family of Mr. Kelley's friend making those communications available to the prosecution.

"As Trial Counsel, based upon the foregoing, as well as the possibility of co-defendant's testimony, I was required to make certain judgment calls during the trial, which I did, based upon my knowledge of the case and discussions with the defendant."

This reasoning is at best murky. However, even if we were to accept Kelley's argument this reasoning demonstrates his counsel's lack of a rational tactic basis for his decision not to move to suppress the evidence under Evidence Code sections 352 and 1101, we would not reverse. It is not reasonably probable a verdict more favorable to Kelley would have been returned had counsel moved to exclude the evidence.

Kelley argues introduction of the writings was highly prejudicial because it resulted in admitting evidence of other uncharged homicides, i.e., his admission "Im killing people for money. Ive rolled about 7 of them already" and his admission he had "put a couple of extra holes in [the] head" of a man in Las Vegas and admission of an uncharged prior assault, i.e., "remember what we did to the bum at Kennedy." Kelley also argues introduction of the letters was prejudicial because they were "replete . . . with crude and offensive discussions of appellant's sexual escapades, which . . . were not relevant in the slightest; and with equally crude discussions of appellant's drug and alcohol abuse, another wholly irrelevant subject."

The jury here was presented with strong, clear evidence showing Kelley and Serrato had a plan to rob Farr by playing a drinking game, Kelley and

Serrato were witnessed buying beer and taking Farr to the Pacific Bell building and Farr's body was found in the Pacific Bell building the next day. The evidence Kelley was involved in the Farr murder was overwhelming; it is highly unlikely that exclusion of the writings would have resulted in any other verdict or that the jury convicted Kelley of first degree murder based on the references to other uncharged, unproven crimes or based on Kelley's sexual and drug escapades.

## V

### *Flight Instructions Were Proper*

Kelley contends the court erred in giving the jury CALJIC No. 2.52, the "flight" instruction.

The trial court gave CALJIC No. 2.52 as follows: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

Kelley contends the instruction should not have been given because the identity of the perpetrator was contested. He quotes the following language from *People* v. *Anjell* (1979) 100 Cal.App.3d 189, 199-200 [160 Cal.Rptr. 669]: "The fact that a robber fled the scene is of no assistance to a jury where the defendant does not dispute that all elements of the crime were present but denies that he was the robber. This is true because the instruction becomes relevant only if the sole contested issue in the case—the defendant's identity as the robber—is assumed. Even if the robber's flight tends to show his (the robber's) guilt, this is immaterial unless the jury believes that the defendant is the robber. If such is the case, there is no need to 'connect' him with the crime any further."

From this language, Kelley extrapolates a rule that the flight instruction should never be given when identity is disputed. He asserts there is "[a] host of cases" which have so held.[7] Kelley has misinterpreted these cases. *Anjell* and the other cases hold that a flight instruction should not be given when identity of the person fleeing is in dispute. Here, the evidence supporting the instruction was not the flight of some unidentified perpetrator, but Kelley's

---

[7]*Anjell*'s dictum on the flight instruction has been criticized by a number of courts. (See, e.g., *People* v. *Batey* (1989) 213 Cal.App.3d 582 [261 Cal.Rptr. 674]; *People* v. *Simon* (1989) 208 Cal.App.3d 841, 851 [256 Cal.Rptr. 373]; *People* v. *Cowger* (1988) 202 Cal.App.3d 1066 [249 Cal.Rptr. 240].)

flight from San Diego immediately after Farr's killing. Thus, this case is distinguishable from *Anjell* since the identity of the person fleeing was not disputed. (See *People* v. *Batey, supra,* 213 Cal.App.3d 582, 587; *People* v. *Simon, supra,* 208 Cal.App.3d 841, 851; *People* v. *Scott* (1988) 200 Cal.App.3d 1090, 1094 [246 Cal.Rptr. 406].)

## DISPOSITION

The judgment is modified to reduce Kelley's conviction for conspiracy to commit robbery to conspiracy to commit theft. In all other respects the judgment is affirmed, and the petition for habeas corpus is denied.

Wiener, J., and Work, J., concurred.

A petition for a rehearing was denied June 14, 1990, and appellant's petition for review by the Supreme Court was denied September 13, 1990.